**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward HAYNES, Defendant-Appellant.**

**No. 72–1290.**

United States Court of Appeals, Fifth Circuit.

Sept. 25, 1972.

Robert Benham, Cartersville, Ga., for defendant-appellant.

John W. Stokes, Jr., U. S. Atty., J. Owen Forrester, P. Bruce Kirwan, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before TUTTLE, COLEMAN and CLARK, Circuit Judges.

TUTTLE, Circuit Judge.

The principal ground of appeal from this conviction for violating Section 844 (i), Title 18 U.S.C. and of Section 5861 (d) of Title 26 U.S.C. is that there was not sufficient evidence from which the jury could find the defendant-appellant guilty beyond a reasonable doubt.

Because appellant's conviction was based largely on circumstantial evidence from which the jury, in order to convict, was required to draw inferences that were inconsistent with sworn testimony, we think it necessary to state the facts surrounding the occurrence in order that it be made clear why we find that there was sufficient evidence to warrant submission of the case to the jury.

The First Count of the indictment was as follows:

### COUNT ONE

"On or about September 20, 1971, in Floyd County, within the Northern District of Georgia, EDWARD HAYNES, by means of an explosive, that is an incendiary device commonly known as a "Molotov Cocktail," did attempt to damage a building, that is the Arts Exhibits Building and others, located at the Coosa Valley Fair Grounds, the same being property used in and affecting interstate commerce, in violation of Section 844(i), Title 18, U.S.C."

The Second count is also reproduced here.

### COUNT TWO

"On or about September 20, 1971, in Floyd County, within the Northern District of Georgia, EDWARD HAYNES did knowingly possess a firearm, that is a destructive device being an incendiary bomb commonly known as a "Molotov Cocktail," which had not been registered with the Secretary of the Treasury or his delegate as required by Section 5841, Title 26, U.S.C., in violation of Section 5861(d) of Title 26, U.S.C."

The *undisputed* facts which were brought out at the trial of the case included the following. The Coosa Valley Fair was about to open in the vicinity of Rome, Georgia, on the 21st of September, 1971. For two or three weeks in or about the city of Rome, there had been racial confrontations and disturbances in the course of which feelings were rather tense in the community. The Coosa Valley Fair Grounds were bounded on one side by East First Street. Shortly after midnight two police officers who were on duty in the Fair Grounds while the last of the preparations were being completed for the opening of the Fair on the morrow saw what turned out to be a "Molotov Cocktail" (a bottle of gasoline with an ignited wick) come over into the Fair Grounds from the direction of First Street. One of the bottles landed on the ground and exploded and the other landed on the roof of a quonset type building and rolled onto the ground and remained intact. A few seconds later a third such object was seen by the officers to come towards the fence separating First Street from the quonset type building above mentioned. It fell either just inside or just outside the

fence and there burned, but did not explode. Just before the third object was thrown, Officer Orr fired a pistol six times in the air. Immediately after it was thrown he saw the headlights of an automobile proceeding east on East First Street, his first vision of the headlights being at approximately the area from which the trajectory of the flaming bottle would have brought it to the fence. The lights of this automobile proceeded on out First Street. Immediately after this Officer Orr saw a second set of headlights going west on East First Street down to approximately the same point mentioned above, at which point the automobile backed and turned around and then proceeded out in the same direction as the first automobile. The remains of the three bottles were found, analyzed and determined to have contained gasoline. Although the times vary as between the witnesses it is not disputed that Haynes did drive his car out East First Street within fifteen minutes after the fire bombs were seen. Haynes is a black male 27 years old.

*Conflicting* evidence, taken, however, most strongly in favor of the Government, as it must be in this posture of proceedings, would permit the jury to find the following facts. The headlights of the second car were those of an unmarked police car driven by Lieutenant Free who, with a partner, was proceeding west. As they came over the brow of a slight hill at a short distance east of the point where the above mentioned trajectory commenced, Lieutenant Free stated that he saw the top of an automobile and the reflection of the lights of an automobile approaching him. Before he saw the full outline of the car itself he observed what appeared to be a flame going over the top of the automobile in the direction of the Coosa Valley Fair Grounds. He testified that he saw neither a hand nor an arm throw the object but that it had a trajectory beginning at the left side of the automobile and going over towards the fence. Within approximately a second he reached the spot where he passed the other automobile which he estimated at that time to be going 35 miles an hour towards him. His car was proceeding 15 miles an hour. He recognized the occupant of the other automobile as the defendant, Haynes. He saw the bottle burning beside the fence, but by the time he had turned around and had noted a small fire caused by a piece of cloth burning in the street, it was too late for him to undertake to make an immediate pursuit of the Haynes automobile. He, therefore, radioed others to apprehend Haynes. This was later done by officers who went to Haynes' home and arrested him and took him in custody. The automobile dealer who had sold the car owned by Haynes' mother, identified as the car seen by Lieutenant Free, testified that when he picked the car up a day or two later, he smelled gasoline fumes in the interior of the automobile. There was ample evidence that the Coosa Valley Fair attracted interstate visitors and that the amusements were transported from state to state and that exhibits contained in some of the buildings were produced outside the state.

Since no person testified to having seen Haynes actually throw the fire bomb and, since throughout the trial of the case, it seemed to be assumed by all parties that whoever threw the bomb that Lieutenant Free claimed to have seen must also have thrown the other two bombs which landed at a distance of some 50 feet from the position in which any automobile would have been if travelling on First Street, and in view of eyewitness testimony by persons living in the vicinity that they had seen other persons on foot throw the three firebombs, and in view of alibi testimony given by a filling station owner who testified that Haynes was with him at the filling station or was with him while he was taking his brother home at a distant point in Rome until about 1:00 in the morning and that Haynes had not left his filling station until 1:00 or 1:05 a. m., and in view of testimony of the same filling station operator that some 30 minutes before Haynes left another

person named Clay and a companion had stopped at the station and obtained gasoline and some emptly bottles and had cut a piece of hose from a residence adjacent to the filling station, and had then driven out First Street towards the Fair Grounds, the appellant says that it was not only physically impossible for anyone to have accomplished the feat of throwing the bottles out of the left hand seat of a moving automobile 50 feet over the fence into the Fair Grounds but that the sworn testimony should prevail over the inferences that might be drawn from the circumstantial evidence.

■ The burden on appellant to show that the evidence that is submitted to the jury in a criminal case and which results in a verdict of guilty was insufficient to justify the verdict is a hard one to carry. This court must consider the evidence adduced on the trial in the light most favorable to the Government and then decide whether it is sufficient to satisfy us that a jury could have found the defendant guilty beyond a reasonable doubt on the evidence thus submitted. The nature of the inquiry on appeal has been stated in Gordon v. United States, 5 Cir. 1971, 438 F.2d 858 where we stated:

"The formula for testing the sufficiency of the evidence was stated in Glasser v. United States [315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680]: 'The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.' (fn. omitted) This includes drawing all reasonable inferences and making all reasonable credibility determinations favorable to the Government. (fn. omitted.) Furthermore, in considering the sufficiency of the evidence we do not determine whether it establishes guilt beyond a reasonable doubt, but only whether the evidence would permit the triers of fact to find the defendants guilty beyond a reasonable doubt." (fn. omitted.)

At first blush the appellant makes a persuasive argument that it would be well-nigh a physical impossibility of which the court could take judicial notice for a person travelling some 30 to 35 miles an hour to light and throw out of the left side of an automobile three "Molotov Cocktails", two of which landed some 50 feet away from the automobile and some ten feet apart and the third of which landed in approximately the same line, but a relatively short distance from the automobile. However, upon further consideration it is realized that the indictment charged Haynes not with throwing the three "Molotov Cocktails" but thowing one ("an incendiary device"). Also, while it would clearly be impossible, if Haynes had been driving at 30 or 35 miles an hour while throwing three "Molotov Cocktails" for two of them to have reached the same spot in the Fair Grounds and the third at a point opposite them at the fence, because at some stage of the throwing he would have been several hundred feet away from the points of impact, the difficulty for the appellant here, is that all the jury had to believe of the testimony given was that Haynes threw one "Molotov Cocktail" over the roof of his car and that it landed against the fence, although directed at the buildings being used by the Coosa Valley Fair. The jury might also have believed that Officer Free's evidence of the speed of Haynes' car was not of sufficient significance to keep it from determining that the other two "Molotov Cocktails", testified to by Officer Orr in the Fair Grounds, could have been thrown by Haynes sitting in the car either while it was standing still or slightly moving just before he threw the last one which was seen by Lieutenant Free and which fell short. In other words, the jury did not have to proceed on the assumption that the first two missiles were thrown from a car travelling 35 miles an hour or any other speed.

Appellant is further faced with the difficult problem that, while he did have the affirmative testimony of several persons who told of having seen either two or three people on foot light and throw

the missiles at approximately the time in question, the stories given by the several witnesses varied to such a degree that they could have been disbelieved by the jury. Finally, while Officer Orr said the first "Molotov Cocktail" landed at "12:54 or 12:55 a. m." and Mr. Shelley, the filling station operator, testified that Haynes had not left his place of business until 1:00 or 5 minutes after, neither of these witnesses testified that he had looked at his watch or taken an exact note of the time. The jury therefore, could have found that there was merely a mistake of a few minutes as to the time given in the testimony of one or the other without attributing perjury to either.

■ We conclude that the trial court did not err in submitting the case to the jury for want of sufficient evidence from which it could have found Haynes guilty beyond a reasonable doubt.

A second point, however, is raised by the appellant here which gives us considerable difficulty. In undertaking to explain why the officers were on duty in the Fair Grounds at the time they saw the incendiary devices thrown over the fence, the Government proved that there had been racial unrest in the city for some little time prior to the occurrence that brought about this prosecution. The defendant himself took the witness stand and testified that he had driven out First Street a short time after the time testified to by Officer Free; that he had not left Mr. Shelley's filling station until 1:00 a. m., as testified to by Shelley. He testified that he saw the burning piece of cloth in the road, as testified to by Lieutenant Free and saw the blaze in the grass where other evidence indicated that the last "Molotov Cocktail" had landed.

The defendant was then subjected to rigorous cross-examination, part of which included questions by Government counsel as to his possible participation in an earlier, unrelated, fire, rock throwing at policemen at the scene of the fire, and racial confrontations with the police. The court permitted this cross-examination by the prosecuting officer after objection had been made by Haynes' counsel after the following questions were asked and answers given:

"Q  Prior to this time, Mr. Haynes, had there been what is commonly referred to as racial tension in Rome?

A  Yes, it had been a big disturbance going on for about two weeks.

Q  Did you take any interest in that at all?

A  Not at all.

Q  You didn't go to any of the meetings about the different—"

Upon counsel's objecting to the relevance of these questions the United States attorney stated: "I would like to ask him some questions which would go to the issue of motive." Thereupon the court held a bench conference out of the hearing of the reporter. The court then stated: "The objection is overruled within the limitations had between counsel and the court."

This incompletely reported ruling left open to the prosecutor the opportunity to question Haynes about the earlier fire, his possible participation in rock throwing at the firemen (all of which Haynes denied, and to support which the government produced no evidence) and then the following questions and answers resulted.

"Q  You saw the fire, you saw the police car?

A  Right.

Q  How far do you live from there?

A  It's about two miles. Well, from my house to Shelley Brothers is exactly three miles so I say it's about two and a half miles.

Q  And seeing what you saw, you went directly home?

A  Right.

Q  Didn't stop to talk to any police officer about it?

A  No. I've seen quite a bit of fires. That's why. You know, all—everywhere—I've seen that house you're talking about. It burned for a day and a half, you know. They left it

burning. They didn't even put it out. When you say a fire, I just noticed the fire; went on. Wasn't anything else for me to do. I wasn't about to get out and put it out.

Q The fire you saw there on Broad Street, ultimately there were fire trucks there, is that right?

A Yeah, the one right there. There's a package shop where I hang out a lot.

Q You saw a fire burning on the ground over there in the grass by the fence and there wasn't any fire truck there, was there?

A No, wasn't no fire truck there when I went along.

Q The Fair Ground is right there?

A The Fair Ground, yes, the Fair Ground.

Q You didn't call the fire department?

A No. I mean—

Q You didn't stop to tell the police department, 'Look, there's some fire up there in the grass by the Fair' or anything like that, did you?

A I thought they would notice it once they got over there anyway. I met the car. If I hadn't met the police, I wouldn't have called them and told them there's a fire burning.

Q Just let it burn?

A I wasn't going to be involved.

Q Burn, baby, burn—

MR. BENHAM: We are going to object to the talk by the Solicitor of burn baby burn. He's trying to strike at the emotions of the jury.

THE COURT: Yes, sir, Mr. Forrester. You disregard the remark of Mr. Forrester."

At the conclusion of the trial the following colloquy occurred between counsel for appellant and the court.

"MR. BENHAM. My third motion, Your Honor, is a motion for a new trial based on the statements made by the U.S. Attorney, that statement being one of 'Burn, baby, burn.' That statement was so inflammatory that it destroyed the jurors' rationale and impartiality in this matter and was made simply for the purpose of destroying that rationale and impartiality.

THE COURT: Well, now, a motion for a new trial is prematurely made. A motion for a new trial wouldn't be made until after there were a conviction. Of course, if there wasn't a conviction, it would be moot. What you are moving for is a mistrial.

MR. BENHAM: Yes, Your Honor.

THE COURT: I think normally you have waived the motion for a mistrial if you don't insist upon it at the time any event occurs. Of course, I did at that time admonish the jury to disregard that statement and I would do it again, Mr. Benham, but I'm inclined to think that to give them any further admonition at this point might merely just spotlight it or focus on it and I'm sure you don't want me to do that. I will be glad to admonish them again to disregard such a statement *and that it was improper*, but I did give them that admonition at the moment. If you feel that it wasn't a strong enough admonition, I will do it again, if you don't think that it will unduly focus on the point. (emp. added)

MR. BENHAM: I'll just withdraw that particular motion then.

THE COURT: All right, sir. I don't want to focus on something and call their attention to it again. I think we must assume that with my instructions that they will disregard such a statement."

◼ It is impossible to read this line of questioning of the accused about racial disturbances, confrontations, throwing rocks at firemen, and the long discussion about a burning house and the questioning of Haynes containing the strong implication that he had a duty to call the fire department to attend to the fire in the grass by the side of

the road[1] without coming to the conclusion that Government counsel was placing himself in a position most effectively to throw out to the jury the inflammatory phrase "Burn, baby, burn" a remark not only improper but also inexcusable because no more prejudicial expression could be dreamed up to arouse the emotions of a jury in the context of this trial and the setting so carefully built up by the asking of the earlier questions about the unrelated fire.

This is not a case which was tried long after the occurrence. The trial was had slightly more than a month after the fire bombs were thrown in the grounds. Under such circumstances, ordinary fairness would require that every effort be made to try a case having so great possible emotional overtones, where the only real issue was the identity of the individual involved, with as little relationship as possible to the general conditions of racial unrest that had prevailed in the community a scant six weeks earlier.

This court is not privy to the conversations at the bench, because the colloquy after defendant objected to the line of testimony with respect to outside incidents was out of the hearing of the reporter. However, since Government counsel stated that he wished to produce evidence to show motive, we must necessarily assume that he represented to the court that he proposed to connect Haynes in some manner with the earlier fire about which he was questioning him. No such connection was ever shown. All that was shown was an effort by the prosecution to create the implication by this line of questioning that the defendant was in some way connected with this event about which he was being questioned. In point of fact, the only connection between it and anything else of sig-

nificance was that it built up what might be called the contrived drama of the trial to the point where the prosecuting officer felt it could most effectively repeat the slogan "Burn, baby, burn".

The impropriety of government counsel's interjection of this racial shibboleth is too obvious to require comment. In order fully to appreciate the prejudice that could flow from the remark it is entirely appropriate for the court to consider the quoted cross-examination. By obviously attempting to imply that Haynes was acting improperly in not either stopping to put out the fire by the fence or notifying the fire or police departments (although Officer Free was already, himself, at the same spot together with his fellow officer) after the equally obvious attempts to create the impression that Haynes had participated in the fire two weeks earlier, the scene was set for the effective use of the slogan "Burn, baby, burn".

The government seeks to counter the appeal on this point by stating that the trial court sustained an objection by Mr. Penham, counsel for the appellant, to this remark. As noted in the quotation above, counsel said, "We are going to object to the talk by the solicitor of 'Burn, baby, burn.' He's trying to strike at the emotions of the jury." The court then said, "Yes, sir, Mr. Forrester. You [apparently addressing the jury] disregard the remark of Mr. Forrester." Thereafter, at the conclusion of the testimony, and before the case was submitted to the jury, this matter was again called to the court's attention, as is also indicated in the quotations set out above. The trial court offered to admonish the jury once again about government counsel's remark, but told counsel that he was of the opinion

---

1. The evidence of both Lieutenant Free and of the defendant coincided on the fact that Lieutenant Free's car was at the same spot, that is where the fire was burning at the side of the fence at the same time Haynes testified he was pass-

ing there, thus, leaving the clear question as to the propriety of any implication that a passerby would be under the duty to notify the police or fire department of the existence of the fire.

it would focus the jury's attention on it and it would be of more harm than help. It is instructive to note the court's language.

"Of course, I did at that time admonish the jury to disregard that statement and I would do it again, Mr. Benham, but I'm inclined to think that to give them any further admonition at this point might merely just spotlight it or focus on it and I'm sure you don't want me to do that. I will be glad to admonish them again to disregard such a statement *and that it was improper*, but I did give them that admonition at the moment. If you feel that it wasn't a strong enough admonition, I will do it again, if you don't think that it will unduly focus on the point." Emphasis added.)

Here, for the first time, the court mentioned the possibility of telling the jury that the remark was "improper". The court did not admonish government counsel when the objection was made, nor did it tell the jury that the remark was "improper". Here the court's offer to do so was hedged by its doubtless genuine concern that this would "merely spotlight it or focus on it". In other words, the court seemed to share the belief of counsel for the defendant that an admonition by the court to disregard the inflammatory statement would not have the effect intended.

We construe counsel's response. "I'll just withdraw that motion, then" merely as agreement with the court that further comment about the remark would hurt more than help.

The final question is whether this error, induced by the prosecution, should be noticed under the plain error rule, Rule 52(b). F.R.Crim.P. The trial judge, himself, in the quoted language used by him at the end of the trial, seemed to share defendant's fear that the jury could not follow the court's instruction to disregard the inflammatory remark. Moreover, we are not faced with the situation where, when the objection was made, the trial court not only cautioned the jury to disregard it, but

also stated to the prosecuting officer that the uttering of the slogan by him was highly improper, as it was. It was only at the end of the trial, out of the presence of the jury, that the trial court indicated that it shared the criticism by defense counsel as to the impropriety of the remark as distinguished from merely an irrelevant comment which the jury had been instructed to disregard.

Under the test stated in this court's opinion in Odom v. United States, 5th Cir. 1967, 377 F.2d 853, we are satisfied that prejudice to the defendant was clear. We are satisfied that the error was prejudicial to the extent that it may have had some substantial influence on the jury, or at the very least, we are left in grave doubt as to the proposition, Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

The defendant therefore was denied the fair trial to which he was entitled, and his conviction must be reversed.

The judgment is reversed, the conviction is set aside and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.