**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Clarence J. QUINN, Jr., Defendant-Appellant.**

No. 74–2309.

United States Court of Appeals, Fifth Circuit.

June 23, 1975.

John R. Myer, Atlanta, Ga., Howard Moore, Jr., Berkeley, Cal., for defendant-appellant.

John W. Stokes, U. S. Atty., William P. Gaffney, William Radek, Asst. U. S. Attys., Atlanta, Ga., Lee J. Radek, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and ROSENN,* Circuit Judges.

COLEMAN, Circuit Judge.

On May 15, 1973, the grand jury for the Northern District of Georgia indicted Reverend Clarence J. Quinn, Jr. for extortion and attempted extortion in viola-

* Of the Third Circuit, sitting by designation.

tion of the Hobbs Act, 18 U.S.C., § 1951,[1] as follows:

## COUNT ONE

That, on or about December 16, 1972 at Atlanta, Georgia, in the Northern District of Georgia, CLARENCE J. QUINN, JR., did unlawfully, knowingly and wilfully obstruct, delay and affect, and attempt to obstruct, delay, and affect interstate commerce and the movement of articles in commerce by extortion through the wrongful use of fear in violation of 18 U.S.C.1951, to wit, by obtaining from Federico Kiesling, District Supervisor, American Discount Stores, Inc., New York, New York, which corporation operates the American Discount Store, 40 Whitehall Street, S.W., Atlanta, Georgia and other retail stores in various states, all of which receive and sell goods shipped in interstate commerce, a check in the amount of three hundred ($300.00) dollars payable to the Greater Edgewood Baptist Church, and subject to Quinn's personal use, which was obtained with the consent of Federico Kiesling by the wrongful use of fear of economic loss namely by the use of pickets at American Discount Store in Atlanta, Georgia.

## COUNT TWO

That, on or about January 6, 1973 at Atlanta, Georgia, in the Northern District of Georgia, CLARENCE J. QUINN, JR. did unlawfully, knowingly and wilfully obstruct, delay and affect, and attempt to obstruct, delay, and affect interstate commerce and the movement of articles in commerce by extortion through the wrongful use of fear in violation of 18 U.S.C.1951, to wit, by obtaining from Paul Daumit, Chairman of the Board, Daumit Stores, Inc., St. Louis, Missouri, which firm operates Shaw Clothes, Atlanta, Georgia and other retail clothing stores in various states, all of which receive and sell goods shipped in interstate commerce, a check in the amount of five hundred ($500.00) dollars payable to the Greater Edgewood Baptist Church, and subject to Quinn's personal use, which was obtained with the consent of Paul Daumit by the wrongful use of fear of economic loss namely the threat of pickets at Shaw Clothes in Atlanta, Gerogia.

Reverend Quinn waived jury trial and was found guilty by the Court on both Counts. He was given concurrent sentences of six months incarceration, with three years probation.

---

1. The Hobbs Act, which was originally enacted as the Federal Anti-Racketeering Statute, provides:

§ 1951. Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.

18 U.S.C.A. § 1951 (1970).

The grounds asserted in support of reversal are that (1) the evidence was insufficient to establish guilt of the offense charged and (2) the convictions infringed appellant's First and Fifth Amendment rights.

We affirm the convictions under both Counts One and Two.

### I

Reverend Quinn was a black minister and civil rights activist in Atlanta, leading a congregation at the Greater Edgewood Baptist Church, running a day care center sponsored by the Church, and president of an organization known as the Christian Leadership Union at Work. As pastor of the Church, Quinn received no fixed salary, but was free to make withdrawals from various church bank accounts. The evidence showed that he drew primarily from the day care center account, to which he had unlimited access and used at his sole discretion.

The CLUAW was a civil rights organization, the main objective of which was securing increased economic opportunity for blacks in Atlanta. One of its major concerns was insuring that black employees in the Atlanta business community received adequate pay. The organization would canvass black employees to determine their salaries. If a worker complained, or the CLUAW felt that the pay was too low, negotiations with the employer would be undertaken. The negotiations with the employers would often be accompanied by an employee strike and picket lines in front of the business establishment. Upon the appearance of the pickets a settlement would usually be shortly forthcoming be-cause the picket lines brought business to a virtual standstill.

It is undisputed that the bulk of the merchandise traded at all stores mentioned herein came from points outside Georgia.

### II

■ Viewed in the light most favorable to the verdict,[2] there is substantial evidence of the following facts common to both counts in the indictment:

(1). Picketing a store under the conditions prevailing in this case drastically reduced business volume in the most profitable season of the year (Christmas) and could result in serious financial loss, if not the closing of a store.

(2). The storeowners feared such an eventuality, and it was this fear which prompted their contacts with Quinn.

### III

■ Evidence of Quinn's intent and purpose in carrying on the activities[3] which prompted the indictment was provided by Herbert Springer, of Springer's Department Store, who testified that contemporaneously with the events alleged in the indictment he was forced to pay Quinn $700 to remove a picket line in front of his store.

Over objection, Springer testified that his company had a store in Atlanta and one in Washington, where he lived. On December 17, 1972, led by Quinn, Springer's employees were picketing the Atlanta store. On that day Quinn telephoned Springer, suggesting that he come down to Atlanta to discuss the situation. Springer offered to pay Quinn's expenses

---

2. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

3. This proof concerned an incident which was recent, indeed contemporaneous; Quinn's role in it was unchallenged; the conduct was almost exactly similar; it had probative value; the need for it was generated by the defense that Quinn was not committing extortion but was merely selling his influence. Moreover, this case was tried to the Judge, not to a jury. See United States v. Waller, 5 Cir., 1972, 468 F.2d 327, cert denied, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588; United States v. Lawrence, 5 Cir., 1973, 480 F.2d 688; United States v. Broadway, 5 Cir., 1973, 477 F.2d 991; United States v. Boyd, 5 Cir., 1971, 446 F.2d 1267; Hamilton v. United States, 5 Cir., 1969, 409 F.2d 928; United States v. Cavallino, 5 Cir., 1974, 498 F.2d 1200; United States v. Miller, 5 Cir., 1974, 500 F.2d 751, and United States v. Goodwin, 5 Cir., 1974, 492 F.2d 1141.

to come to Washington for the conference, but this was declined. So, on December 18, Springer went to Atlanta. He conferred with Quinn at the Church.

Springer testified:

"I asked Reverend Quinn what it would take to get the strike over with . . . . We started horse trading. He asked for $10,000 and I offered $25."

The ultimate agreement was for $700, which was paid by check, carrying the notation "Donation to Church". The notation was put there at Quinn's request.

Springer further testified:

"[B]efore I delivered it [the check], I asked him 'If I give you this check, how long would it take for the pickets to be off, to stop picketing?'"

Quinn asked if ten minutes would be fast enough.

They went back to the store and Quinn called off the pickets. Springer further testified that during the picketing his business "fell down to nothing"; that Quinn first demanded cash, which he refused to pay; and the cancelled check was endorsed "Greater Edgewood Baptist Church Day Care", to which Quinn had unrestricted access.

## IV

### COUNT ONE

Count One charged Quinn with extortion in obtaining $300 from the American Discount Store on December 16, 1972.

In December, 1972, the American Discount Store was operated as a retail general merchandise business in Atlanta. The store employed approximately seven persons, most of whom were black, and it sold most of its merchandise to members of the black community.

In early December, Reverend Quinn asked Roberto Kiesling, the store manager, about employee compensation. Kiesling refused to supply that information, but he did give Quinn the name of the district supervisor, Frederico Kiesling. Roberto then reported the incident to Frederico, who was out of town at the time. Quinn pursued his inquiry at a later date, this time informing Roberto Kiesling that he represented the CLUAW. At this point, Roberto gave Quinn the information regarding employees' wages. Quinn demanded that he be granted a conference with Frederico Kiesling to discuss the matter further.

On December 14, Frederico Kiesling arrived in Atlanta. On the morning of December 15, he met with several employees who presented him with a request for an increase in pay. Kiesling told them that no immediate action would be taken on their demands, but that the matter would receive consideration after the first of the year. The employees then returned to work. Soon thereafter, Quinn entered the store and demanded to speak with Frederico.

He and Kiesling conferred on the matter of higher pay, but Kiesling refused to authorize an immediate raise. At this point Quinn left Kiesling's office and spoke with several employees. Shortly thereafter, all the black employees of American Discount walked out of the store and, with Quinn, set up a picket line outside.

During the afternoon, Quinn and five employees of American Discount were arrested for blocking a sidewalk and obstructing traffic and were taken to jail. While in jail Quinn incurred expenses of $180 for bail bond premiums to obtain the release of himself and the five employees. The premium on the bail bonds was taken to the bonding company office by Quinn's secretary. It came from a petty cash fund kept on hand at the Greater Edgewood Baptist Church. Quinn obtained the services of an attorney to represent him and the five employees in connection with the obstruction of traffic charges. This attorney appeared in court on their behalf.

The next day, Saturday, December 16, Quinn and the five employees resumed their picketing in front of the American Discount Store. Being forced by the picket line to face drastic decline in the ordinarily heavy Christmas business,

Frederico Kiesling called Quinn into the store to negotiate.

At this time Quinn and Kiesling reached an agreement that the employees of American Discount would be given an immediate pay increase. Kiesling refused, however, to pay the employees for the time they had missed during the strike. Quinn then requested that Kiesling pay $200 to cover expenses *of the strike.* Kiesling resisted this proposal, but nevertheless called his New York office for authorization. After some discussion of the matter, the main office approved a $200 payment. Quinn then asked for an additional $200 to cover *picketing* expenses. Kiesling contacted the New York office once more and was told that the request was excessive, but that Kiesling should exercise his own judgment in reaching a settlement. After further negotiation with Quinn, Kiesling finally agreed to pay $300 to cover all expenses.

The method of payment, however, had some cloudy overtones. At first Quinn demanded cash. When Kiesling told him that he would need a receipt, Quinn refused. Next Quinn suggested that Kiesling issue a check to the Greater Edgewood Baptist Church for $300, marked as a "donation", but Kiesling insisted that any check would have to be marked as "expenses." This was the day before Quinn telephoned Springer in Washington and two days before Springer gave him "a donation" of $700 to call off the pickets.

Finally, Quinn agreed to accept payment in the form suggested by Kiesling, and a check for $300 was issued on Roberto Kiesling's personal account, payable to the Greater Edgewood Baptist Church, for "expenses".

Once the payment had been made, the district supervisor called the store employees into the office and explained the settlement, but did not mention the $300 payment. When the employees learned that they would receive an immediate increase in pay, they stopped the strike and returned to work. Some two weeks later, on December 27, 1972, Quinn paid his attorney $120 for appearing in court in connection with the obstruction of traffic charge which had been filed on December 15.

The Hobbs Act defines extortion as

" * * * the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S. C.A. § 1951(b)(2) (1970).

The evidence supports the finding that the payment which Frederico Kiesling made to Quinn was induced by fear. The record clearly indicates that the picketing had a disastrous effect on the business of the American Discount Store and that Kiesling wished to end the disruption as soon as possible.

■ In order, however, to prove Hobbs Act extortion the government must not only show that a person involved in interstate commerce has parted with his property out of fear but it must also establish that the payment was "wrongful"—that the alleged extortionist had no lawful claim to the property.[4]

This aspect of Hobbs Act prosecutions is the result of the Supreme Court's decision in United States v. Enmons, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), the Chief Justice and Justices Douglas, Powell, and Rehnquist dissenting.

In *Enmons* the Court was confronted with the issue of whether the use of violence in a labor strike to obtain higher wages was "extortion" within the meaning of the Hobbs Act. After a careful analysis of the wording of the Act and a review of its legislative history, the Court concluded that the use of violence in the course of a lawful labor strike to obtain increased wages was not "extortion" for purposes of the Act. *Enmons* dealt only with the lawful objec-

---

4. United States v. Enmons, 410 U.S. 396, 399–400, 93 S.Ct. 1007, 1008–09, 35 L.Ed.2d 379, 382–83 (1973).

tive of higher wages. Payment to a labor representative, either made or demanded, in violation of the Taft Hartley Act, was not involved.

The Court concentrated its attention on the meaning of the term "wrongful" as it is used in part (b)(2).[5] The Court determined that the term "wrongful" did not modify the terms "force, violence, or fear", because in that case the term would have little meaning, since force, violence, or fear in themselves connote the use of wrongful conduct. Instead, the Court reasoned that the term "wrongful" is used to limit the coverage of the Act; obtaining property by force, fear, or violence is "wrongful" only in those instances where the alleged extortionist has no lawful claim to the property sought.[6]

In the context of labor disputes, then, the Hobbs Act does not condemn the use of coercive measures to obtain wage increases, provided labor furnishes the employer with genuine services in exchange for the wages sought.[7] On the other hand, the Act does proscribe the use of coercive means to exact personal payoffs[8] or to obtain "wages" for unwanted or superfluous services.[9] Thus, the effect of *Enmons* was to remove from the reach of federal criminal law the use of coercive tactics to obtain increased wages, but with the caveat that the prosecutor's hand would be stayed *only* when the payment is gained in furtherance of legitimate labor objectives.[10]

In the case at bar, the District Court was aware of the teachings of United States v. Enmons, *supra*. It nevertheless found that the $300 payment to Quinn was essentially a personal payoff, therefore beyond the protection of *Enmons*. Conceding that the payment of picketing expenses might constitute an element of a legitimate labor settlement, the trial court felt that the facts surrounding the payment in this case militated against the conclusion that Quinn was obtaining reimbursement of picketing costs. The Court was particularly influenced by the fact that Quinn first demanded cash and then requested that the check be marked as a "donation". Moreover, the actual amount of the attorneys' fees was not known at the time of the payment and

---

5. Part (b)(2):

"The term 'extortion' means the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C.A. § 1951(b)(2) (1970) (emphasis added).

6. The Court explained:

The term "wrongful," which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—would be superfluous if it only served to describe the means used. For it would be redundant to speak of "wrongful violence" or "wrongful force" since, as the Government acknowledges, any violence or force to obtain property is "wrongful." Rather, "wrongful" has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be "wrongful" because the alleged extortionist has no lawful claim to that property.

410 U.S. at 399–400, 93 S.Ct. at 1009–10, 35 L.Ed.2d at 383.

7. United States v. Enmons, 410 U.S. 396, 400, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379, 383 (1973).

8. United States v. Enmons, *supra*; United States v. Hyde, 5 Cir., 448 F.2d 815, cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1971); United States v. Iozzi, 4 Cir., 420 F.2d 512, cert. denied, 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1970); United States v. Stirone, 3 Cir., 311 F.2d 277, cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1962); United States v. Tolub, 2 Cir., 1962, 309 F.2d 286; United States v. Floyd, 7 Cir., 228 F.2d 913, cert. denied, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466 (1956); Bianchi v. United States, 8 Cir., 219 F.2d 182, cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955); Hulahan v. United States, 8 Cir., 214 F.2d 441, cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954).

9. United States v. Enmons, *supra*; United States v. Green, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494 (1956); Bianchi v. United States, 8 Cir., 219 F.2d 182, cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955); United States v. Kemble, 3 Cir., 198 F.2d 889, cert. denied, 344 U.S. 893, 73 S.Ct. 211, 97 L.Ed. 690 (1952).

10. United States v. Enmons, *supra*; see also, United States v. Caldes, 9 Cir., 1972, 457 F.2d 74.

was not paid until almost two weeks after Quinn received the American Discount check.

On the other hand, the evidence did show that in connection with his own arrest and that of the five American Discount employees Quinn incurred expenses for bond premiums and for legal representation. When all the bills had been paid, the total of these expenses amounted to $300—$180 for premiums on bail bonds and $120 for the services of Quinn's attorney in representing the picketers in court.

Since Quinn actually incurred the claimed expenses in an effort which led directly to an increase in pay for the American Discount employees, the $300 payment, in the absence of a statute forbidding it, might ordinarily be characterized as a reimbursement. The amount was near, if not exactly, the amount paid out or to be paid out, and the payer obviously knew what it was for. Although Quinn asked that the reimbursement be falsely labelled, reimbursement for the bail and legal expenses was the ground asserted from the beginning.

The primary question is whether Quinn's collection of this money is enti-

tled to the protection of the *Enmons* shield.

The government conceded on oral argument that if the payment had been made directly to the employees, they receiving it instead of Quinn, the answer would be affirmative. Quinn had advanced the bond money and incurred the attorneys' fees on behalf of the employees. Thus, it might be said, there was no substantial difference between reimbursing the employees and reimbursing Quinn, at least no difference which would support a criminal conviction under the Hobbs Act.[11]

The government asserts, however, that in order for the payment to be free of wrongfulness it had also to be free of any violation of federal labor law; that Quinn was acting as a labor representative, and that therefore his receipt of a payment from the employer, American Discount Store, constituted a violation of § 302(b) of the Taft Hartley Act.[12]

The Taft Hartley Act specifically declares that it shall be unlawful for any employer to *pay, lend,* or *deliver,* any money or other thing of value to any representative of any of his employees. The statute further makes it unlawful

**11.** See the Court's discussion of the intended application of the Hobbs Act, 410 U.S. at 399–400, 93 S.Ct. at 1009–1010, 35 L.Ed.2d at 382–83.

**12.** Section 302(b) of the Taft-Hartley Act, 29 U.S.C.A. § 186(b) (1970), is designed to prevent collusive labor activity between management and employees. The Act states in pertinent part:

§ 186. Restrictions on payments and loans to employee representatives, labor organizations, officers and employees of labor organizations, and to employees or groups or committees of employees;

. . .

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which repre-

sents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

for any person to request, demand, receive, or accept, any payment, loan, or delivery of any money or other thing of value in violation of the above prohibition.

The statute, 29 U.S.C., § 186(c) contains several exceptions to these absolute prohibitions. One of these, appearing in Section 186(c)(2), permits the payment or delivery of any money or other thing of value "in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute *in the absence of fraud or duress*". [Emphasis added].

In United Steelworkers of America, AFL–CIO v. United States Gypsum Company, 5 Cir., 1974, 492 F.2d 713, 734, this Court said that "the purpose of § 302(a) is to protect employers from extortion and to insure honest, uninfluenced representation of employees".

This is no doubt the reason that the stated exception applies only *in the absence of duress*. We have already demonstrated that fear of serious financial loss was the fulcrum from which Reverend Quinn, with no formal labor organization, pursued his activities.

■ The legislative history clearly indicates that the Taft Hartley Act was not formally incorporated in the Hobbs Act, and criminal laws are to be strictly construed.[13]

■ Looking, however, to *Enmons* standards, Quinn, in the status of a labor representative using duress, had no lawful claim to the money he demanded and received, even as reimbursement of money he, as a volunteer, had spent or obligated himself to spend on behalf of himself and others. By the same reasoning, the payment could not have been demanded or received as in pursuit of a *legitimate* labor objective.

Therefore, the conviction on Count I must be affirmed.

We reach this conclusion, although conceding that:

1. A *bona fide* labor dispute existed between American Discount and its employees;

2. The attainment of higher pay was, on the part of the employees, a legitimate labor objective;

3. The employees got the higher wages;

4. Reverend Quinn was authorized by the American Discount employees to represent them and to act as their spokesman;

5. Although not authorized by the employer, the nominal expense actually incurred for bond premiums and legal representation was relevant to the effort in progress;

6. Quinn, however, was not an employee of American Discount. He had no expectation of becoming an employee. He had no expectation of receiving increased wages. Thus, it might be said that *personally* he had no claim at all, but nevertheless demanded and received the money.

The decisive point is that federal labor law, applicable to every person alike, specifically declared that Quinn, in the exercise of duress, had no lawful claim to the payment; its receipt was statutorily declared not to be a legitimate labor objective. Thus, it was wrongful and the *Enmons* rationale provides no defense.

## V

### COUNT TWO

■ The evidentiary situation as to Count Two of the indictment is quite different to that encountered in Count One. In Count Two the government charged Quinn with extortion in obtaining $500 from Paul Daumit, an officer of Shaw's Clothing Stores, Inc., through the use of threats of labor picketing.

In this Count the evidence is clear that Quinn was never authorized by Shaw's employees to represent them in a *bona*

---

**13.** See discussion in United States v. Enmons, *supra* (Douglas, J. dissenting opinion). The interrelationship between the Hobbs Act and federal labor law is also extensively discussed in Note, 14 B.C.Ind. & Com.L.Rev. 1291 (1973).

*fide* labor dispute or in the attainment of a legitimate labor objective. Unlike what happened at American Discount, the employees of Shaw's received no benefits whatever. Indeed, there is no showing that they were actually aware of Quinn's contacts with Daumit. There had been no expenses to reimburse. Nevertheless, using the threat of picketing as the cogent implement of fear, Quinn obtained $500 from Daumit, using the same formula he had invoked, or attempted to invoke, with both Springer and American Discount, the donative cloak. The "donation" was made to an account to which Quinn, at his sole discretion, had unlimited access.

Consequently, the *Enmons* rationale has no relevancy to the situation prevailing under Count II.

The action opened at Shaw's during the same month which had seen the encounters with Springer and American Discount. Quinn entered Shaw's Clothing Store in Atlanta and claimed to the manager that he had received complaints from the employees about low wages. The evidence to support this assertion is sparse.[14] There is no evidence that Quinn had ever met with Shaw's employees as a group or that they had authorized him to act as their spokesman or representative.

The store manager told Quinn that he had no authority to grant pay increases without home office approval. Quinn responded that this answer was unsatisfactory and that unless something was done, *he would put a picket line in front of the store.* So, the threat of picketing was a part of the initial contact.

The manager immediately called Paul Daumit, chairman of the board of the company owning Shaw's in St. Louis, Missouri, and put him on the line with Quinn. Quinn told Daumit that he was the President of CLUAW, that he had received complaints from employees about low wages, and that Daumit should come to Atlanta to discuss the matter. This was the customary Quinn *modus operandi* in dealing with non-resident owners; he demanded that they come to Atlanta for negotiations. Daumit replied that the store manager would be qualified to settle the problem, or else it should be handled then and there by phone. Quinn again insisted that Daumit come to Atlanta, this time informing Daumit that should he fail to come, a *picket line would be placed in front of the store.* This was the second picket threat. Daumit then agreed to come, but explained that at that time he was planning to enter the hospital for surgery. Quinn stated that it would be agreeable to him if Daumit postponed his trip until after the operation. After several more phone conversations throughout December between Quinn and Daumit, a meeting was finally arranged for Saturday, January 6, 1973.

In the course of one of the conversations in December, Quinn told Edward Daumit, Paul Daumit's son, that the picket signs had been made and that in all other respects the CLUAW was ready to picket Shaw's Clothing Store.

Prior to going to Atlanta, Paul Daumit contacted the United States Attorney in St. Louis with reference to Quinn's demands. Subsequently, the F.B.I. came into the case. In addition, Daumit also contacted other merchants in Atlanta to obtain further information on Quinn's activities. Herbert Springer, of Springer's Department Store, informed Daumit of his $700 payment to the appellant. In the telephone conversations with Daumit, however, Quinn did not mention a personal pay off or a donation.

> Reverend Richard Mitchell, Jr., a Shaw employee, testified that he spoke with Quinn while Quinn's organization was picketing Springer's store, and he told Quinn someting to the effect, "When you're through over here, come on over to our place." Record, p. 470. There was no further elaboration.

14. Two employees at Shaw's testified that they had talked to Quinn in December, and that Quinn had asked them how much they were earning. Both replied that they were making $1.60 per hour. One of these employees was part-time help at the store, and she informed Quinn of this fact. He responded that he was interested only in the salaries of the full-time employees.

On January 4, 1973, Paul Daumit arrived in Atlanta. He spent the next day being briefed by the F.B.I., and on January 6, he met with Reverend Quinn at the Greater Edgewood Baptist Church. Prior to meeting with Quinn, the F.B.I. equipped Daumit with transmitters. Therefore, much of his conversation with Quinn, the crux of Count Two, was recorded on tape and admitted into evidence. The transcript of the tape is too lengthy for appropriate incorporation in this opinion. Approximately an hour was required for a Judge of this Court to hear it through. All Judges have read the transcript of the tape.

At their meeting, after exchanging pleasantries, Rev. Quinn explained his method of operations. Omitting pauses, lapses, and immaterial comments, Rev. Quinn's explanation may be digested as follows:

My folk here call me the agitator but it's not that. We have a board and I am just the president. Whenever they have a crisis, whether its racial discrimination or unfair wages, we try to go in and assist these people. If there is a business that's not paying fair wages we go in and we don't take no guns, no knives and stuff like this, we just go in and have a peaceful picket sign in front of the store which says to our people that we would appreciate it if you didn't patronize this business. . . . Your people aren't satisfied with the wages that they're getting down there. . . . We have picketed quite a few places this year, I'm pretty sure you're aware of it.

\* \* \* \* \* \*

Daumit: Well, God, I wouldn't want that [picketing], that would ruin me.

Quinn: That would ruin anybody.

\* \* \* \* \* \*

Quinn: We'd like to see those people make a little more money down there. . . . We ain't doing no picketing now, a little cold out there, but we always say, "Well, it's not going to stay cold (laughs) all week, one day it's going to warm up, and we got a lot of them lined up on the list, and I might as well be fair with you, yours is on there, too.

Quinn then informed Daumit that his place was supposed to have been picketed during Christmas week, that it had not been done because Daumit was sick, and that "they don't do it [picket] unless I say do it . . . and I got chewed out the other night for not letting you come before now, but I told them that after all I was the President, I make the decision, you know."

Ultimately, Quinn asked Daumit how much he was paying his employees per hour. Daumit said that the question indicated Quinn did not know what the employees were being paid. Quinn countered that he was only trying to see if the employees were telling him the truth. Daumit then called on him to state what the employees were making. Quinn responded, "$1.65 an hour". "Like hell", answered Daumit, who proceeded to point out that in addition to receiving the minimum wage the sales employees also received certain commissions.

Upon being informed of this, Quinn stated, "I've saved you up to thus far", that he believed in being fair, that he would protect Daumit's business—that he was not going to let them picket Daumit's store—for Daumit to go on down to Florida, relax and forget about it. Shortly afterwards the subject of the employees apparently came to an end.

If matters had stopped at that point, there would be nothing to this prosecution, but it did not stop there.

Daumit *testified* that he was much relieved and got up to put on his coat [there is a pause in the tape at this point] but that Quinn reopened the subject by saying that if anything else came up he would be back in touch with Daumit. Daumit's response to this remark was that he wanted to settle all matters then and there. Quinn respond-

ed that he did not know of anything else, but added that his people might know of something else.[15]

A long pause followed, and then [after an interruption in the tape] Daumit stated the amounts of compensation that the various employees at Shaw's Clothing were receiving. He then added that if there was anything that he could do to help Quinn, that Quinn should not hesitate to call on him. To this remark, Quinn responded, "Well, there's something you can do to help us. You know we got a school here, 150 kids there, and we support our schools ourselves." Daumit replied that this was not what he had in mind. Quinn then stated that the contribution would be tax deductible and that as a result of helping the day care center, Daumit would gain a friend in the city where his business was. Daumit responded that he would like to think about it, to which Quinn responded, "What's there to think about? (Laughs) O.K." Daumit then agreed to a tour of the school.

While showing Daumit through the day care center, Quinn explained the benefits to be derived from making a contribution. He pointed out that not only would Daumit be helping black children to become better citizens, but that business advantages would flow from a contribution, as well. In this latter vein, Quinn informed Daumit that on at least one prior occasion picket lines had been called off against a merchant who had made a donation to the day care center.

The tape indicates that Daumit seemed confused by Quinn's persistence, and he questioned Quinn as to whether there would be a picket line should no donation be made. Quinn replied that he did not threaten people like that (laughed).

After more conversation, the following transpired:

Daumit: If I thought that if I walked out of here and didn't give you anything that I wouldn't have a picket out there, I'd walk out.

Quinn: Wait a minute, come again?

Daumit: I said that if I thought I would, if I walked out of here without making a donation to your church, uh, if I didn't make a donation to your church that you would not picket me, that I wouldn't have any further, that I wouldn't have any trouble anyhow, but I don't know whether I would want to give you any money.

Quinn: (Laughs)

Daumit: Now I'm being very honest about it.

Quinn: (Continues to laugh).

Daumit: All right, isn't that the way you'd rather have me be?

Quinn: Well, that's the only way to be.

Daumit: Yeah (unintelligible).

Quinn: That's the only way to be. Now let me see if I can understand you correct. You said if you walk out of my church and didn't give a donation to my school—

Daumit: Yeah.

Quinn: And, uh, if you thought you did this, that the store would be picketed. Is that what you, am I following you?

Daumit: Yeah.

Quinn: Then, uh, you would do it, is that what you are saying?

---

15. Quinn: Now, if something else comes up I can give you a buzz, you know.

Daumit: Well, look, if anything else's going to come up please let's discuss it now.

Quinn: I don't know of anything else.

Daumit: There shouldn't be anything. We have, uh, some possibility of things happening, I don't know what they could be.

Quinn: Well, like I said . . .

Daumit: You know, you're demands with the, if there's anything that you have on your mind now, now's the time, uh, don't hold back, you know. I mean if you know anything that I don't know now's the time for you to tell me about it.

Quinn: Well, my people may know something that I don't know you know, like I said, we have meetings once a month, and, uh, there's nothing else that I know of as of now.

Daumit: If I have to give it to you I'll talk with you about, you know, about it, but if I don't have to I don't want to, that's what I've been trying to say.

Quinn: Well, I believe you said over there in the office that it takes two hands (unintelligible) [to wash each other] and I was impressed, uh, that a friend help me, I believe that was the impression, that this is what you meant. Maybe you didn't mean it.

Daumit: Yes, yes, I did.

Quinn: So what I'm saying is this right here, see I can't afford, even if I was in a position where I needed somebody to help me, I can't afford to let a man like you or nobody else, you know, give me nothing, not that I don't trust them, I can't afford to do that because of the fact . . .

Daumit: Couldn't afford to do what?

Quinn: Permit you to give me any money.

Daumit: Or give to your church.

Quinn: Well, my church is different. I think everybody in the world ought to give to (unintelligible).

Daumit: But, if I don't give to the church, then what?

Quinn: Well, in the first place, the church doesn't have nothing to do with our organization.

Daumit: All right.

Quinn: Course, this doesn't mean you just have to give it to our school, you know, I understand there's a need for helping, uh, the black community as a whole, you know.

Daumit: Yeah.

Quinn: And, uh, if you don't want to give it, uh, I mean, its your money, you know (unintelligible) you know what I mean, somebody else will give it.

Daumit: Well, would I have a picket on my store?

Quinn: Well (laughs) I think, I think you really don't understand, you see, you ain't never have been picketed before, have you?

Daumit: No never.

Quinn: I see, I see, uh, I'm trying to see how I'm going to go about phrasing this thing. OK, I'll put it like this right here, OK. Now your, your store could have been picketed.

Daumit: Yes.

Quinn: It could have been picketed a long time ago, by that I mean two or three weeks ago.

Daumit: Yes.

Quinn: They wanted to picket your store.

Daumit: Yes.

Quinn: I protected your store though because of the fact you told me you was sick.

Daumit: Yes.

\* \* \* \* \* \*

Quinn: So, therefore, it gives you the impression that I am your friend.

Daumit: All right.

Quinn: Isn't that the way you feel about it?

Daumit: Well, I thought so, but I didn't think about the other (unintelligible).

Quinn: Well what I'm saying is right here, you impressed me to believe that I was your friend, after you know, I didn't let them do that. Evidently you thought I was your friend because you offered, you know, to help me, you know.

Daumit: Well, the church or whatever.

Quinn: But I, I don't need any help.

Daumit: Un huh.

Quinn: I mean the church takes (unintelligible).

Daumit: Well, all right, fine but it still boils down to what?

Quinn: My school, my school.

Daumit: Are you saying that if Paul Daumit, uh, you know, are we saying Paul Daumit if you don't help my school or help somebody, I might put the pickets back on.

Quinn: No, we're not going to put no picket around your store, *unless there's a request from your employees* [emphasis added].

Daumit: Well, then now you know there's no request been made through my employees.

Quinn: It hasn't been?

Daumit: Well you said you didn't, you hadn't, uh, said that in so many words.

Quinn: Well, this is the reason why we called you because of the fact they said they wasn't getting enough pay . . . we went in your store and your people said they wasn't getting enough pay, you know, that's the reason why I asked you down.

Daumit: You never asked them, you never asked them what they were making or anything, apparently.

Quinn: We asked them, we have, we talked to them (unintelligible) as a group. Your manager, he talked to (unintelligible) we talked to all of 'em. You have a preacher working down there, too, or you had one down there (unintelligible).

Daumit: Yeah.

Quinn: But I don't want you to feel like because of the fact that you don't make a donation to the black community that your store will be picketed because I don't want you to feel like that, 'cause this is not our (unintelligible) of doing, you know, we don't, we won't go into a man's business unless his employees calls us in and says that we need your help. (Pause). Same thing happened at First National Bank, I mean, we was called, we went over there and so, we had a meeting with them and they did what we asked them to do, and then they turned around and sent, sent, uh, sent a donation to, our school but not because of the fact they felt like (unintelligible) pickets because there wasn't no picketing to be done.

Daumit subsequently inquired how he could be assured that everything would be all right in the event that he did make a donation. Quinn replied that he had stuck to his word in the past and that he would stick to his word now. Daumit asked how much Quinn wanted him to give, to which Quinn replied that the amount would be left up to Daumit. Daumit then suggested giving a couple of hundred dollars. Quinn laughed at the suggestion.

The following remarks closely followed:

Quinn: But my point to you is this, I don't want to impress you that because I'm the President of this organization that if you don't make a contribution to our place that we'll picket your store, I don't do it like that, that's not my way of doing it . . . .

\* \* \* \* \* \*

Quinn: So, it's the same thing, if you do something to help the need of my black children in here, whenever anything happens to your place, all you got to do is call me, and I'll say, "Well, this man is my friend. He helped my little black children". Now, am I getting the point over now?

Daumit: I think so, I'm not real sure, I'll I think I understand what you're saying. If, if, if somebody were to bother me down there, all I got to do is call you.

Quinn: Just call me, right I'm your friend.

Daumit: And you said there will be no pickets down there.

Quinn: No, no, no, you can forget about that.

Daumit: Forget the pickets.

Quinn: You can forget about that.

Daumit: Then they won't bother me.

Quinn: No they're not going to. If they, if anybody bothers you, just call me. (Pause). You follow what I'm saying?

Daumit: Yeah.

Quinn: Now I wasn't going to let them picket your store because I told you this evening before you said that you wanted to help me that I wouldn't let them picket your store, now didn't I?

Daumit: Yeah.

Quinn: So that should let you know right there that, uh, I'm not asking you to donate something to my school to call off the picket line, I called that off even before you said you wanted to help me.

Daumit: Yeah, but I'm thinking of the future, Reverend.

Quinn: Ain't nothing going to happen.

Daumit: (unintelligible).

Quinn: (unintelligible) I'll be like this, I'll be your friend.

Daumit then asked what would happen if someone else were to threaten his business. Quinn assured him that there was nothing to worry about. Quinn explained that he was on good terms with all the other leaders in the black community, and that if the organizations controlled by these leaders threatened any harm, that he would keep them from taking any action. Quinn added, however, that he could fend off these other organizations only if Daumit was paying his employees sufficiently. Daumit then assured Quinn that he was paying his employees sufficiently, after which the following exchange took place:

Quinn: OK, so I'll be your friend. (unintelligible) You can see the devil in me.

Daumit: Well, of course, I, I need a friend but I—

Quinn: You just want to make sure you got a friend.

Daumit: That's right, plus I don't want to have anything more to happen (unintelligible). You know what I'm trying to say (unintelligible) a—

Quinn: You want (unintelligible) you just go on back to St. Louis or wherever you live, or Florida, just forget about this whole thing.

Daumit then asked how large a contribution Quinn desired. Quinn replied that Daumit should be guided by the Holy Spirit in this matter, but that $200 would not buy very much equipment for a day care center in these times. The following exchange ensued shortly thereafter:

Quinn: Now I'll tell you something confidentially between the two of us.

Daumit: Yes, sir.

Quinn: We had a picket line out at a man's store one time, he offered to give us $30,000.

Daumit: (Whistles)

Quinn: But I mean he could (unintelligible) to move the picket line and, uh, what I did then I got mad with him and we closed it up, and he offered to give me $30,000. Okay, now if I had took $30,000 from him and moved the picket line, just because of the fact he gave me $30,-000, when he could have gave it to the community, what kind of a leader would I be, what kind of leader would I be? I wouldn't have the people following me that I have following me, now, because whatever happened in the dark (unintelligible) comes to the light.

Daumit: Yeah.

Quinn: Now I could have gone on and took that money and I could have taken money from other places, but one day it would have come out, then my people would have stopped following me, see, that's the reason why I told the guy I didn't need him to help me because if I got in a tight or something I got a lot of friends I can go to, you know, but I'll ask anybody to help my (Pause) Now if you write a check to my school for $1,000, you can take it off your income taxes.

Daumit: I am not about (unintelligible) anywhere near that (unintelligible) *I'll close the darn store first!* [emphasis added]

Quinn: There you go again, there you go again, now if we've got pickets involved in your organization, we don't want to work it like that.

Daumit: I know but you know I mean—

Quinn: I mean, what you want to do, to help my school?

Daumit: To help me! To help me, I'll help your school, if you help me.

Quinn: Tell me what you want me to do, and I'll tell you whether I can do it or not.

Daumit: I want you to keep the pickets away.

Quinn: Okay, I can do that.

Daumit: All right, for—that's it?

Quinn: That's it.

Daumit: Without $200?

Quinn: I can do that without, no, uh.

Daumit: Or whatever.

Quinn: Well now I'll put it like this right here, if I'm going to be your friend, I think you ought to at least help my folk.

Daumit then promised to contribute $400 to the day care center, but he explained that Quinn would have to come to his hotel room to get the check.[16] Quinn then suggested that the contribution be changed to an even $500, and Daumit agreed.

The two men left the Greater Edgewood Baptist Church and proceeded to Daumit's hotel room, where Daumit issued a check to the day care center for $500. Upon leaving Daumit's hotel, Quinn was arrested and taken into custody by the F.B.I.

On appeal, Quinn's primary challenge to his conviction on Count Two is that the evidence presented to the District Court was insufficient to prove guilt beyond a reasonable doubt. Essentially, he argues that the conversation which took place at the Greater Edgewood Baptist Church cannot be characterized as extortion but was merely a sale of influence.

The District Judge had a different view. He described the conversation as "some of the most subtle extortion that could be consummated".[17]

While noting that no isolated segment of the conversation constituted a threat, the Court concluded that "a review of the events would support the government's position that the defendant was obtaining money from Shaw Clothes under the pretense that it would avoid racial problems and picketing".

The Court further observed that the facts militated against a finding that Daumit was merely making a charitable contribution to the church day care center. It emphasized that the encounter between Quinn and Daumit was foreign to the dealings normally associated with the acquisition of charitable donations.

The Court found that Quinn was selling his influence under the threat of picketing which would destroy his victim's business.

Unlike Count One, the evidence contained nothing of substance to support the idea that the $500 check was paid in settlement of a *bona fide* labor dispute.[18] The payment was in no way connected with the furtherance of a legitimate labor objective.

 In a prosecution of this kind it is not necessary that the government prove that the fear was a consequence of a direct threat. Rather, it is sufficient if the government can show circumstances surrounding the alleged extortion which

16. The F.B.I. had advised Daumit to use this site if possible when, and if, a payment was made.

17. United States v. Quinn, 364 F.Supp. 432 (N.D.Ga.).

18. The payment involved in Count Two was clearly not the type of payment protected by United States v. Enmons. *Enmons* protects only those payments where the alleged extortionist has a lawful claim to the property. Specifically, the Court in *Emnons* was referring to wages and other employee benefits commonly associated with normal labor negotiations. Quite unlike the type of payment condoned in *Enmons*, the payment involved in Count Two was, at best, a contribution to a church day care center. Such a payment is totally foreign to the context of normal labor settlements. United States v. Enmons, 410 U.S. 396, 399–400, 93 S.Ct. 1007, 1009–10, 35 L.Ed.2d 379, 382–83 (1973).

render the victim's fear reasonable.[19] Fear of economic loss is a type of fear proscribed by part (b)(2) of the Hobbs Act.[20] In a case such as this, where the alleged victim is co-operating with the authorities, the inquiry is not whether the alleged extortionist will be allowed to carry out his threat, but whether the threat itself is reasonably calculated to instill fear in the victim.[21] The Hobbs Act forbids attempted extortion as well as actual extortion. Therefore, in a case where the F.B.I. foils the actual offense, it is possible for one to commit attempted extortion. In the instant case, the indictment charged both actual and attempted extortion.

## VI

### THE DECISION ON COUNT TWO

■ Our appellate role is narrowly circumscribed. We may not substitute our view of the evidence for that of the trier of the fact. Rather, viewing the evidence in the light most favorable to the verdict, we must confine ourselves to deciding whether that verdict is supported by substantial evidence.[22] In the performance of this function the relevant inquiry is whether a judge or jury could reasonably conclude that the evidence, and the inferences which might reasonably be drawn therefrom, was sufficient to establish guilt beyond a reasonable doubt.[23]

■ The fear of picketing, and its consequences, is really not disputed. This was the general situation and it provided the springboard from which the subsequent events were launched.

As to Quinn's contacts with Daumit, the evidence substantially supported the following:

1. Under the threat of picketing, brandished from the outset, Quinn called Daumit to Atlanta. He informed Daumit that he was President of an organization capable of enforcing the picketing. He told both Daumit and his son that the picket signs had already been prepared.

2. He was not authorized by Shaw's employees to seek an increase in pay on their behalf.

3. The threats aroused such fear in Daumit that he forthwith consulted a United States Attorney and subsequently co-operated with the F.B.I.

4. After prolonged fencing, Daumit said, "If there's anything I can ever do to help you, why, you don't hesitate to call on me", Quinn promptly said, "There

---

**19.** United States v. DeMet, 7 Cir., 1973, 486 F.2d 816, 820, cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); see also, United States v. Addonizio, 3 Cir., 451 F.2d 49, 73, cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); United States v. Glasser, 2 Cir., 443 F.2d 994, 1006, cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971); Carbo v. United States, 9 Cir., 1963, 314 F.2d 718, 740; United States v. Tolub, 2 Cir., 1962, 309 F.2d 286, 288–89; Callanan v. United States, 8 Cir., 1955, 223 F.2d 171, 175–76; cf. People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 878, 168 N.E.2d 683 (1960).

**20.** United States v. Jacobs, 5 Cir., 451 F.2d 530, cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972); United States v. Hyde, 5 Cir., 448 F.2d 815, cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1971); United States v. DeMet, 7 Cir., 1973, 486 F.2d 816, 819, cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); United States v. Addonizio, 3 Cir., 451 F.2d 49, cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); United States v. Iozzi, 4 Cir., 420 F.2d

512, cert. denied, 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1970); United States v. Tolub, 2 Cir., 1969, 309 F.2d 286; Cape v. United States, 9 Cir., 1960, 283 F.2d 430; Bianchi v. United States, 8 Cir., 219 F.2d 182, cert. denied, 349 U.S. 915, 75 S.Ct. 604, 90 L.Ed. 1249 (1955).

**21.** United States v. Jacobs, 5 Cir., 1971, 451 F.2d 530, 540, cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

**22.** Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Davis, 5 Cir., 1973, 487 F.2d 112, cert. denied, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974).

**23.** United States v. Johnson, 5 Cir., 1974, 496 F.2d 1131; United States v. Bass, 5 Cir., 1974, 490 F.2d 846; United States v. Ragano, 5 Cir., 1973, 476 F.2d 410; United States v. Schechter, 5 Cir., 475 F.2d 1099, cert. denied, 414 U.S. 825, 94 S.Ct. 127, 38 L.Ed.2d 58 (1973); United States v. Haynes, 5 Cir., 1972, 466 F.2d 1260.

is something". When Daumit said he would like to think about it, Quinn asked, "What is there to think about?" and laughed. Although Daumit said he had not had donations in mind and would walk out without giving one if he knew he would not be picketed, Quinn persistently insisted on a donation.

When Daumit asked, "Are we saying, Paul Daumit, if you don't help my school or help somebody, I might put the pickets back on?", Quinn's response was "Not unless there's a request from your employees", a possibility not calculated to allay Daumit's fears since Quinn had already assured him that such a request had been made. The cudgel was only temporarily parked in the closet, capable of being taken out and put to use at any time. The long interview suggested no way of avoiding such an eventuality but by making a "donation".

Moreover, Quinn, in pursuit of the "donation", considered it relevant to tell Daumit how he had closed one man down, although he had been offered a pay off of $30,000 not to do so. He said he did not accept the pay off personally but implied that he would have accepted it if it had been offered to the black community. In any event, the connotations of Quinn's awesome power to destroy a business and the huge amount mentioned would not ordinarily be lost on anyone of average intelligence in Daumit's situation.

Immediately following the recitation of this anecdote, Quinn suggested that Daumit donate $1,000. Daumit responded that he would "close the darn store first". He then offered four hundred dollars. Quinn subsequently said, "Just make it an even five". Thereafter, Quinn accepted a check for that amount and was promptly arrested.

The $700 pay off extracted from Springer illuminates the intent and purpose with which all this was done.

The verdict of the District Court that appellant's conduct [on Count Two] amounted to extortion under the Hobbs Act is supported by the evidence.

We next consider appellant's argument that his conviction violates his First and Fifth Amendment rights in that (1) the application of the Hobbs Act in this case is unconstitutionally overbroad, in derogation of Quinn's First Amendment rights and (2) the Hobbs Act as applied in this case is so vague as to violate due process.

 It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all. As the Fourth Circuit succinctly stated in United States v. Marchetti, 466 F.2d 1309, 1314 (1972), "Threats and bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal". Appellant cites Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Watts, however, involved a public harangue, of a political nature, and the threat against the President, for which he was indicted, was only conditional.

 As to the due process argument, the Hobbs Act is constitutional, Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182, cert. denied 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955).

The judgments of conviction as to both Counts One and Two are

Affirmed.

THORNBERRY, Circuit Judge (specially concurring):

Although I am in full agreement with Judge Coleman's discussion of Count II, I concur in affirming Quinn's conviction on Count I only because I think that the prosecution introduced evidence from which the district judge could have concluded beyond a reasonable doubt that the $300 payment was a personal payoff and Quinn's bail bond premium and attorney's fee justification a sham. Personal payoffs are clearly not a legitimate labor objective; hence, use of fear of economic loss to extract them is "wrongful" under the Hobbs Act. United States v. Enmons, 1973, 410 U.S. 396, 400

& n. 4, 406 n. 16, 93 S.Ct. 1007, 1010 & n. 4, 1013 n. 16; 35 L.Ed.2d 379, 383 & n. 4, 386 n. 16.

I express no view on whether reimbursement by the employer of an employee representative who voluntarily paid bail bond premiums and attorney's fees incurred by employees during picketing would constitute a legitimate labor objective or whether such payments made under the implied threat of further picketing would violate 29 U.S.C. § 186(b) despite the language of § 186(c)(2). I must say that I do not understand how the possibility of lawful picketing for a legitimate labor goal could be "duress," which implies wrongful or illegal pressure. Moreover, I have found no statute or decision that makes incidental costs of labor picketing an improper subject for bargaining and settlement between employer and employee representative.