**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert H. BLANTON, III, Jerome Banks and Clyde Daigle,
Defendants-Appellants.**

**No. 85-8737.**

United States Court of Appeals,
Eleventh Circuit.

July 23, 1986.
Rehearings and Rehearing En Banc Denied
Sept. 2, 1986.

Lee Sexton, Jonesboro, Ga. (Court-appointed), for Blanton.

John O. Ellis, Jr., Federal Public Defender, Atlanta, Ga., for Banks and Daigle.

James W. Kesler, Asst. U.S. Atty., Atlanta, Ga., Sara Criscitelli, U.S. Dept. of Justice, Crim. Div., Washington, D.C., for the U.S.

Before JOHNSON and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

## CORRECTED OPINION

JOHNSON, Circuit Judge:

Fassbinder observed that there are occasions when "fear eats the soul." [1] In this case the appellants sought to use the fear of workplace disruption, by themselves and others, as a means to extort from an employer peace payments through a complex, on-going conspiracy. The trial court concluded that the fear-inducing conduct of the appellants constituted, *inter alia*, a violation of the Hobbs Act. We agree with that conclusion, and with the others reached below, and for that reason we affirm the judgment of the trial court on all counts.

### I.

The appellants in this case, Robert Blanton, Clyde Daigle, and Jerome Banks, were involved in the organization of a new labor union, the International Brotherhood of Security Services [hereinafter "IBOSS"], which sought to organize private security employees in places like factories and airports. Blanton was the first president of Local 1 of IBOSS in Baton Rouge, Louisiana. Banks was director of the Internal Secret Service [hereinafter "ISS"] of IBOSS Local 1, which functioned as Blan-

---

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. R. Fassbinder, *Fear Eats the Soul* (1973).

ton's armed body guard. Daigle was the ISS secretary.

In 1984, IBOSS began an organizational drive among the security officers at the Atlanta-Hartsdale International Airport. All three appellants were seen at Hartsdale during a work stoppage and picketing episode in August of 1984. During this time IBOSS submitted petitions to the National Labor Relations Board [hereinafter "NLRB"] seeking to represent the workers at Hartsdale. Though the NLRB held hearings, during the time here relevant they issued no representation decision.

In November 1984 the other IBOSS officers effectively ousted Blanton from his position. The motivations appear to have been internal disagreements and difficulty in borrowing money due to Blanton's criminal record. Blanton had been convicted of murder ten years earlier; that conviction was reversed, after Blanton had served nine years, in a federal *habeas corpus* action. He had also been arrested for possession of an illegal silencer and for rape and had been convicted of shooting into an occupied home. Blanton "resigned" and was retained on a contract that provided, *inter alia,* that he would be paid $235,000/year for life as a consultant. Further quarrelling over the extent of Blanton's control, and an apparent desire to purge "black militants," led to the termination of the contract on December 7 of that year and the ousting of all three appellants from the union.

On December 14, 1984, Banks called the office of Frank Argenbright, president of Argenbright, Inc. Argenbright is one of the companies supplying security services to Hartsdale. Banks left a message that he wanted to help Argenbright "close down" IBOSS and left Blanton's telephone number. Mr. Argenbright knew of Blanton's criminal record due to investigations made during the earlier organizing efforts and became alarmed that this might be the beginning of an extortion attempt. Mr. Argenbright and his vice-president, Mr. Bivins, began a series of tape-recorded telephone calls with the appellants during

which the latter made clear that they were out to close down IBOSS—both to help Argenbright, and to get revenge for their ouster.

Eventually FBI agents were brought into the matter and they took over the dealings with the appellants through Agent Sollars. The appellants negotiated with Sollars for a period of several months, during which the price for destroying IBOSS rose from $6000 to $18,000 plus expenses. Originally the appellants wished to be retained as "consultants" on the Argenbright payroll; later they demanded cash so that there would be no trail that would prevent Blanton from becoming head of a sweetheart company union at Argenbright after IBOSS was out of the picture.

In exchange for this money, Blanton and his two associates maintained that they would come to Atlanta and disclose secret documents to the NLRB, create a notable media event, and use their tremendous influence with the rank and file to "blow IBOSS out of the water." Blanton also made clear that he could help Argenbright set up a company union so that when IBOSS was gone no other union would come in and take over. Blanton stated that if Argenbright did not hire him IBOSS would destroy the Argenbright business. Blanton also suggested that IBOSS itself was trying to buy his documents and thus that Argenbright needed to act quickly. Finally Blanton threatened that, if Argenbright was not forthcoming, he would get rid of IBOSS anyway, set up his own union, and make things difficult for Argenbright. There were several veiled threats of possible violence, either from IBOSS or from Blanton, if things were not quickly resolved.

Because Blanton was on probation, there was some difficulty in arranging for him to come to Atlanta to consummate the deal, but eventually the details were worked out. On February 25 the three appellants arrived with a brief case of secret papers handcuffed to Daigle's wrist. Appellants met with officials of Argenbright, Inc. for 80 minutes, which meeting was recorded on

sound and video tape at Argenbright headquarters. One half of the money, $9000, changed hands. The rest was to be paid upon the destruction of IBOSS. At this point, FBI agents entered the room and arrested Blanton, Banks and Daigle.

The appellants were tried before a jury on four counts: conspiracy to extort in violation of 18 U.S.C.A. § 1951 (1985); extortion by threats of violence, also a violation of Section 1951; solicitation of money in exchange for sworn testimony, 18 U.S.C.A. § 201(i); and solicitation of money in violation of 29 U.S.C.A. § 186(a)(2), (b)(1), and (d)(2).

Blanton put on no defense. Banks and Daigle argued that they had not extorted, but merely offered to engage in a valid business deal—to help protect Argenbright from the illegal organizing actions of IBOSS. They claimed that any taped statements they made that sounded extortionate or threatening were either lies or kidding. All three were convicted on the first three counts and acquitted on the Title 29 solicitation of money count. Blanton received concurrent ten year prison terms on counts one and two, plus a five year probation term on count three. Banks and Daigle each received concurrent two year terms on counts one, two and three.

## II.

This case presents three issues: A) whether the evidence is sufficient to sustain the convictions; B) whether the trial judge erred in giving some government instructions and in declining to give appellants' requested jury instructions; and C) whether the trial court erred in admitting evidence of Blanton's prior criminal record.

## A.

All appellants advance the same position with respect to the sufficiency of the evidence on the extortion counts, one and two, and on the solicitation count, three.

### 1) Extortion:

Appellants argue that the government has failed to make out a violation of the Hobbs Act, 18 U.S.C.A. § 1951 *et seq.* (1985), because they "never threatened to cause physical harm or economic loss to Argenbright, but were only asking for money to aid Argenbright to avoid the economic loss" that IBOSS would wreak. In essence, they argue that the threats here were neither express nor intentionally implicit—that in fact the threat came from IBOSS and that the appellants were being good samaritans trying to help Argenbright avoid the loss IBOSS would cause.

On appeal we will reverse a jury verdict for insufficient evidence only if that evidence, when viewed in the light most favorable to the government, does not substantially support the verdict. The verdict must be sustained so long as a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Lopez,* 758 F.2d 1517, 1521 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986). All credibility choices must be made in favor of those reached by the finder of fact. *Anderson v. Bessemer City,* 470 U.S. 564, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *United States v. Gianni,* 678 F.2d 956, 959 (11th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

Justice Jackson once observed that "[w]hat a man is up to may be clear from considering his bare acts by themselves...." *Cramer v. United States,* 325 U.S. 1, 33, 65 S.Ct. 918, 934, 89 L.Ed. 1441 (1945). In this case, considering only the conduct and statements preserved on the record, the evidence was, to risk understatement, overwhelming. The appellants' *post hoc* explanation of their intentions to the contrary is notwithstanding. The appellants clearly exploited the fears of Mr. Argenbright of violence and economic loss not only from IBOSS, but from the appellants themselves. Repeated references were made to the fact that Blanton had a past criminal record, that he used the other

two appellants as armed body guards, that the body guards had been surreptitiously observing high ranking Argenbright employees, and that if Mr. Argenbright did not utilize their services they might bust IBOSS and then set up their own union among Argenbright employees.[2] The appellants made it clear that Mr. Argenbright and Argenbright, Inc. could not afford to forego their services, due to the threat both from IBOSS and from appellants themselves.

■■■ Beyond this, an actionable claim under the Hobbs Act can be made out even if the threats used to extort are merely subtle and indirect, so long as the government can show "circumstances surrounding the alleged extortionate conduct that rendered the victim's fear of threatened loss reasonable." *United States v. Sander*, 615 F.2d 215, 218 (5th Cir.) (*per curiam*), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). Likewise, in *United States v. Kopituk*, 690 F.2d 1289, 1328 (11th Cir.1982), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983), we noted that in order to win a conviction under the Hobbs Act, "the government need show only that the defendant received the property of another without any lawful claim to such property and that the person who made the payment did so out of fear." That is simply and squarely on all fours with the factual posture of this case. The appellants received $9000 from Argenbright, Inc., they had no lawful claim to that money because they provided no legitimate service, and Argen-bright was induced to make that payment out of fear of violence caused by or contributed to by the appellants. A reasonable jury could have concluded that a Hobbs Act violation occurred.

2) Solicitation:

Appellants also challenge the sufficiency of the evidence that they solicited money in exchange for testimony before the NLRB. The gist of their argument is that it was Argenbright's employees and the FBI agent who kept bringing up that topic, rather than appellants. They claim that while they agreed to testify if necessary they did not think that it would be necessary and that instead they intended to do a number of other things for the money they sought. Appellants also argue that the references to testimony and to being witnesses really referred to appearing in the media and not before a court or board.

■■■ The standard of review here is the same as for the extortion claim. Where testimony is ambiguous, we must defer to the inferences that the jury drew. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *Gianni*, 678 F.2d at 959.

This claim too is meritless, for the record is interlarded with episodes featuring each appellant promising testimony to the NLRB in exchange for payment. Blanton offered to give sworn depositions and to speak privately to "the judge" (presumably the NLRB examiner or the Administrative Law Judge) in his chambers, providing the necessary evidence to shut down IBOSS.[3]

---

2. For example, during the meeting in Atlanta just prior to appellants' arrests, Blanton made the following threat:

> But now you have to make up your mind and I'm sure you will when we leave you gentlemen will be talking about it until the wee hours of the morning. If you want us to leave after the destruction of this [IBOSS] and leave your butts wide open, we will. Now just for the sake of argument I'll probably send somebody here to fuck with ya'. But even if I didn't somebody would, teamsters looking strong at it. They always have. But, like I told them Boys ya'll on bad turf and we got a right to be here if you could in here we gonna fight ya' too [sic].

Government Exhibit 59T at 16.

3. Agent Sollars and Blanton, in a monitored telephone conversation, discussed Blanton's testimony in exchange for the $18,000 payment:

> SOLLARS: O.K., all right that shouldn't be a problem [payment in cash]. Now you understand in looking at it from our point of view, and the attorneys' point of view is that the NLRB is the most important thing and, ah, getting that handled and stopped, ya know, that seems like it would be testimony there.
> BLANTON: Well, first of all, do you remember the judge we went before?
> SOLLARS: No, I don't.

Banks promised to testify personally before the NLRB,[4] as did Daigle.[5] Whether or not Argenbright's people or the FBI brought the subject up,[6] each appellant unambiguously stated that in exchange for the fee to be tendered he would appear before a judge or the Board to offer testimony against IBOSS. This is a clear violation of 18 U.S.C.A. § 201(i), which prohibits demanding, soliciting, accepting or agreeing to accept "anything of value ... because of the testimony under oath or affirmation given or to be given by [the defendant] as a witness upon any such trial, hearing, or other proceeding...." The jury verdict on this point was clearly reasonable and hence must be sustained.

### B.

Appellants raise eight allegations of improper jury charges or failure to give re-

> BLANTON: O.K. I think it would be suitable for you and I, you representing that company, and to go. [sic] The judge and I got along very well at the hearing, because again I came in straight and honest. But I intend to go and see the judge personally.
> SOLLARS: Umm.
> BLANTON: And inform him what's going on and give him the right to go ahead and do some other checking and, ah, that's going to turn the judge against.
> SOLLARS: So that would, you're going to see him and talk on our behalf.
> BLANTON: Right.

Government Exhibit 54T at 12. Blanton also offered to give a sworn deposition on behalf of Argenbright to the NLRB, Government Exhibit 59T at 8, and to become Argenbright's "key witness". Government Exhibit 43T at 11.

**4.** The following statements were made in a monitored call between Banks and Mr. Bivins, an Argenbright Vice President:

> BIVINS: O.K., so are, are we talking about $12,000 for your, for your paper, ah, the papers you have and your testimony against the union before the National Labor Relations Board. Is that what we're talking about?
> BANKS: That's what we're talking about.
> BIVINS: And you're going to testify to the National Labor Relations Board?
> BANKS: I will testify and I would like you to draw up like a subpoena so Mr. Blanton, so he can be subpoena, subpoenaed to come up there, and he can testify. Understand what I'm saying, now.

Government Exhibit 50T at 5–6.

**5.** The relevant discussion between Bivins and Daigle was as follows:

> BIVINS: ... Now, I need to know is the price $18,000 or is it $12,000, that makes a big difference, or is it more than $18,000? What are you talking about? You got an offer of 18, I guess it's more than that right?
> DAIGLE: 18. If you come up with 18 with the plane tickets. When we get down there, you hand me 18 and I turn my documents over and testify and everything, and we'll close this thing down.

Government Exhibit 50T at 5–6.

In a later conversation between Agent Sollars and Daigle, the offer was repeated after Sollars informed Daigle that a subpoena could not be obtained to secure Blanton's appearance in Atlanta:

> DAIGLE: O.K. in that case then Mr. Blanton wouldn't be necessary for right now. All you need is the evidence to present a hearing right?
> SOLLARS: Umm.
> DAIGLE: Well, then you would only need two tickets, round-trip tickets for me and my partner.
> SOLLARS: Umm. And ...
> DAIGLE: To get us up there, and we'll pra..., present the evidence to the NLRB.
> SOLLARS: Umm. Now, well, I'd want to talk ...
> DAIGLE: Upon payment.
> SOLLARS: Pardon?
> DAIGLE: Upon payment.

Government Exhibit 51T at 2–3.

**6.** Appellants appear to be advancing an entrapment defense of sorts. If so, it is too late asserted. Entrapment is an affirmative defense. *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir.1975), *cert. denied*, 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). In this Circuit offering that defense requires the defendant to admit that he committed the acts alleged, *United States v. Brooks*, 611 F.2d 614, 618 (5th Cir. 1980), something that none of the defendants below did. Further, failure to assert entrapment at the district court level precludes advancing it for the first time on appeal. *United States v. Nicoll*, 664 F.2d 1308, 1314 (5th Cir. Unit B), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982). [The current Fifth Circuit has overruled both *Brooks* and *Nicoll, see United States v. Henry*, 749 F.2d 203, 206 & n. 2 (5th Cir.1984) (*en banc*). When this Circuit was created, we adopted the case law of the former Fifth Circuit as it existed on the day of the split, September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*). We are not bound by the subsequent development of the law in the new Fifth Circuit. *Id.* Accordingly, *Brooks* and *Nicoll* are still good law in the Eleventh Circuit. *United States v. Smith*, 757 F.2d 1161, 1168 (11th Cir. 1985).].

quested charges. The allegations will be discussed *seriatim.*

■ In reviewing allegations of error in charging the jury this Court will examine the entire charge to determine whether, on the whole, the issues and law presented to the jury were adequate. *United States v. Abravaya,* 616 F.2d 250, 251 (5th Cir.1980). "A district court's refusal to give a requested instruction constitutes reversible error if and only if the instruction (1) is correct; (2) is not substantially covered by other instructions which were delivered; and (3) deals with some point in the trial so important that the failure to give this instruction seriously impairs the defendant's ability to defend himself." *United States v. Williams,* 728 F.2d 1402, 1404 (11th Cir. 1984).

### 1) Requested Charge 34:

■ Appellants offered Charge 34 as part of their defense that the physical or economic fear which Argenbright experienced was neither exploited by the appellants nor under their control.[7] There is no error here, however, for the requested Charge 34 is an incorrect statement of the law. The second sentence of the proposed instruction directs the jury to focus on an irrelevant fact. Under *United States v. Haimowitz,* 725 F.2d 1561, 1572 (11th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984), the defendant need not actually "cause, or threaten to cause the force, violence, or fear to occur" in order to be convicted of extortion. He need only be aware of the victim's fear and intentionally exploit that fear to his own possible advantage. *Id.*

### 2) Requested Charge 35:

■ Requested Charge 35 [8] presents in capsule form the holding of our opinion in

*United States v. Livingston,* 665 F.2d 1003, 1005 (11th Cir.1982). In that case the defendants were themselves not involved with an extortion scheme, they merely offered to sell information about an on-going embezzlement perpetrated by others. There is no error here for two reasons. First, the factual posture of this case and *Livingston* are markedly different. In *Livingston:*

> [t]he scheme contemplated ... was to offer to inform [the victim of the embezzlement] of the source of past and current economic loss stemming from the embezzlement, in exchange for a monetary payment. The scheme did not contemplate threatening to cause the embezzlement to continue unless payment was made. There was no factual showing that Livingston was involved in the embezzlement or that he knew that any of his associates were involved in it.

665 F.2d at 1005. In the instant matter the appellants did not merely offer to help Argenbright avoid economic loss caused by IBOSS, they also made threats to inflict economic loss themselves and to assist IBOSS in perpetrating the loss it supposedly contemplated if Argenbright was not forthcoming with the money demanded. For example Daigle told Bivins that unless Argenbright acted quickly, and paid a premium fee, Daigle and his cohorts planned to sell the incriminating documents to the union. Thus, unlike the defendants in *Livingston,* the appellants here crafted a "scheme ... threatening to cause the [economic loss] to continue unless payment was made." 665 F.2d at 1005. *Livingston* is simply inapposite.

There was no error for a second reason. Appellants submit that even if this case is

---

7. Requested Charge 34 provided:
   The wrongful use of actual or threatened force, violence, or fear is clearly an essential element of extortion. In order to be guilty of the wrongful use of force, violence, or fear, however, a party must cause, or threaten to cause the force, violence, or fear to occur.

8. Requested Charge 35 provided:

> Offering to sell information concerning a union that the defendant had previously been a member of and offering to help destroy that union, where the defendant has no control over the operation of that union may be morally repugnant but it would not constitutue [sic] extortion as defined in 18 U.S.C. § 1951(b)(2).

not on all fours with *Livingston*, this instruction embodied one theory of their defense and thus they had the right to have the jury consider it. We held in *United States v. Silverman*, 745 F.2d 1386, 1399–1400 (11th Cir.1984), that a defendant is not automatically entitled to a theory of the defense instruction if that argument is adequately covered in another instruction, if it would be confusing, if it is not a legally cognizable defense, or if it merely emphasizes a certain phase of the evidence. *See also United States v. Grassi*, 783 F.2d 1572, 1577 (11th Cir.1986).

All that the appellants sought to convey was that the jury could determine that they were simply seeking to sell information about IBOSS activities without demonstrating the requisite intent to instill fear or intent to exploit that fear. That was adequately spelled out in the instructions that the court actually gave.[9] At best the proposed instruction merely emphasizes an aspect of the evidence that appellants believe is favorable to their defense. *Silverman*, 745 F.2d at 1400. They were not entitled to a *Livingston* instruction under the facts of this case.

3) Requested Charge 20:

■ Appellants challenge as an erroneous instruction the government's requested Charge 20 dealing with the appellants' offer to set up a sweetheart union.[10] They object that this improperly incorporated the provisions of the Taft-Hartley Act into the

Hobbs Act thus permitting the jury to convict, based upon finding the commission of an unfair labor practice, contrary to the holding in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), and to the former Fifth Circuit's opinion in *United States v. Quinn*, 514 F.2d 1250 (5th Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976).

There is no error here because appellants are guilty of selective reading of *Quinn* and its interpretation of *Enmons*. In the latter case the Supreme Court held that an alleged extortionist could not be convicted under the Hobbs Act for violence related to labor union activity aimed at obtaining property to which he had a lawful claim because such conduct was not "wrongful" within the terms of the Hobbs Act, 410 U.S. at 399–400, 93 S.Ct. at 1009–10. In *Quinn* the former Fifth Circuit construed *Enmons* "to remove from the reach of federal criminal law the use of coercive tactics to obtain increased wages, but with the caveat that the prosecutor's hand would be stayed *only* when the payment is gained in furtherance of legitimate labor objectives." 514 F.2d at 1257 (emphasis in original). Securing higher wages in exchange for honest labor provided, the defendant's objective in *Enmons*, is a legitimate labor objective; the creation of a sweetheart union, one objective of the appellants here, is not a legitimate labor ob-

---

**9.** The court instructed the jury as follows:

You are advised further that the use of fear or financial injury is not by itself wrongful, ladies and gentlemen, and because of this fact you are instructed that in determining whether the defendants' alleged threats or fears were criminally wrongful, you should consider the lawfulness of the objective or purpose. If the objective of the party or parties employing fear of economic loss was to obtain money to which the defendants were lawfully entitled, then this element would not be satisfied. It its [sic] only when fear of economic loss is employed to achieve a wrongful purpose that its use would be wrongful.
R. 13–117.

**10.** Requested Charge 20 provided:

I further instruct you, ladies and gentlemen, that as you may recall from the evidence

during the video recorded meeting at the premises of Argenbright, Inc. on February 25, 1984 [sic], the defendant Mr. Blanton discussed the creation of a company union. You are advised that federal law contained in section 158(a), Title 29 of the United States Code makes it an unfair labor practice for an employer on [sic] dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it.

This section not only outlaws company unions dominated by the employer, but also forbids an employer from contributing money to a union it favors or to give a union improper advantages that are denied to rival unions.
R. 13–116—17.

jective—it is illegal. 29 U.S.C.A. § 158(a). *Quinn* and *Enmons* do not bar this action; the jury instruction was a correct statement of the law.

### 4) The "Fear" Instruction:

■ The appellants contest what they characterize as the court's "fear instruction." [11] They claim it improperly failed to insert the word "wrongful" before "fear." They do not say before which of the many appearances of "fear" they wanted "wrongful" inserted. They in any event concede that "the court did correctly define extortion prior to and subsequent to this quoted portion" but argue that "the failure to again use the word wrongful in this portion created a confusing and incorrect charge."

There is no reversible error if the instructions, considered as a whole, accurately present to the jury the issues and the law. *Abravaya*, 616 F.2d at 251. Just prior to this complained-of section the court defined "fear" and "wrongful," and in that section following it the court explained in which situations the use of fear would be wrongful, so as to direct the jury's attention to the object and purpose of the defendants' conduct. Viewed as a whole, there is no reversible error.

### 5) Count 3 Instruction:

Appellants object that the trial court gave an erroneous and confusing instruction on Count 3 to the effect that the government could meet its burden of proof on the solicitation charge simply by showing that the NLRB had not yet issued a ruling at the time the offer to testify took place. [12]

This is frivolous. The instruction at issue was simply defining what constituted "a pending judicial hearing." One necessary predicate to showing an attempt to sell testimony is the possibility that such testimony-for-hire could be presented to a hearing. Again the appellants concede that the court's statements before and after this particular explanation made clear that the actual elements of Count 3 required a request for money in exchange for testimony. We must look to the instruction as a whole, *Abravaya*, 616 F.2d at 251, and here there was simply no possibility of confusion. The appellants' argument is make-weight.

### 6) State of Mind—Past Criminal Acts:

■ Appellants Blanton and Daigle object to the reference in the court's state of mind instruction to Argenbright's testimony about what he had heard of the past criminal conduct of appellants. [13] They

**11.** The "fear instruction" was as follows:

The law requires proof beyond a reasonable doubt that the fear was reasonable and actual, and that the defendant knew of and intentionally used that actual fear, because the law does not hold any man responsible for unforeseeable [sic] or the unreasonable reactions of those with whom he speaks or deals.

But the law does prohibit the knowing or willful creation of instilling of fear, or the knowing and willful use of existing fear when this is done with the specific purpose of inducing another to part with his or her property.

In making your decision as to whether the fear of the alleged victim was reasonable, should you find such fear did exist, you, should use the standard you would use in decisions in your everyday life.
R. 13–119—20.

**12.** The instruction stated:

In this regard, it is not necessary for the government to establish that during the period that the alleged solicitation was made evidence and sworn testimony were being presented to the hearing officer assigned to the administrative proceeding described in count three of the indictment.

All that the government is required to show is that the aforesaid administrative hearing was still pending before the National Labor Relations Board, that a final decision on the issues presented had not been made, and that the evidentiary record could have been reopened in order to present the defendants to testify before the hearing officer.

In short, a pending judicial hearing is one that has been initiated but not yet settled or decided.
R. 13–119—20.

**13.** The relevant language was as follows:

The testimony of an alleged victim as to what the people other than the defendant had told him concerning one or more of the defendants is admissible not for the truth of

premise their objection on the fact that there was no evidence introduced as to Daigle's reputation.

Blanton's argument on this point is frivolous. The record clearly establishes that he has a criminal record and that Argenbright knew about it and was affected by it. Blanton has no basis for objecting to this properly limiting state of mind instruction.

Daigle's position is technically correct; there was no evidence of a criminal record on his part. From that he argues that the jurors could conclude that he committed some crime and that they just missed hearing it. There was no error, however. The trial court's instruction on Argenbright's state of mind was initially confusing, but there is nothing in that ambiguity to suggest affirmatively that Daigle had some past record. In any event, four paragraphs later the trial court explicitly said that any state of mind evidence derived from past criminal acts related only to Blanton, so Daigle has suffered no prejudice.

7) State of Mind—Violence in the Organizing Drive:

■■■ Appellants object to another portion of the state of mind charge, also on the grounds that it suggests the existence of acts not contained in the record.[14] Specifically, they claim the record does not reflect that threatening or intimidating conduct

was actually used during the campaign to organize Hartsdale Airport.

There is no error. Whether or not the organizers actually engaged in the alleged conduct is not to the point; the testimony did not come in for the truth of the matter asserted, as the court explained in that instruction. Rather the question is whether the rumors and allegations of such conduct had an effect on the witness's state of mind. Mr. Argenbright recounted that he had been made aware of a number of instances of threatening conduct by appellants and by other union partisans during the IBOSS organizational drive at Hartsdale. Mr. Argenbright testified that the techniques resorted to were unusual and threatening and that this prompted him to order a background check on Blanton. This in turn provided the evidence of Blanton's past convictions, which caused Mr. Argenbright to fear dealing with him. This was all relevant to Mr. Argenbright's state of mind. It was properly admitted, *Grassi*, 783 F.2d at 1578; Fed.R.Evid. 803(3), and the instruction correctly advised the jury to consider it only for the limited purpose for which the court admitted it.

8) Entrapment:

Finally, the appellants claim that the trial court erred in failing to give their "requested" instruction on entrapment. During the course of deliberations the jury sent out a request for an instruction on entrapment. The trial court refused the request, reason-

---

what was said, but it is admissible only as to whether the hearing of such statements would have tended to produce a reasonable fear in the victim's mind.

Such statements by people other than the defendants to a victim may, therefore, only be considered in determining the victim's state of mind, that is whether there was fear on the part of the victim and whether the fear was reasonable.

R. 13–114–15.

During the course of the trial when permitting a witness to testify as to his or her state of mind there have been instances where references were made to defendant Blanton's alleged criminal past, as well as the threatening or intimidating techniques allegedly used during the labor unions [sic] organizing campaigns. These references were admitted into

evidence for a very limited purpose, that is to allow you to evaluate the state of mine [sic] of the witnesses. You are only to determine if the defendants are guilty or not on the charges set forth in the indictment and nothing else.

R. 13–116.

14. The objected-to language was as follows:

During the course of the trial when permitting a witness to testify as to his or her state of mind there have been instances where references made to defendant Blanton's alleged criminal past, as well as the threatening or intimidating techniques allegedly used during the labor unions [sic] organizing campaigns. . . .

R.13–116.

ing that entrapment is an affirmative defense and appellants never argued it. The court sent the jury back to resume deliberations telling them that appellants had waived an entrapment defense by not arguing it and "as a consequence you don't even consider that in this case."

Appellants concede that they did not request such an instruction before the jury went out though they claim that from start to finish, if they may be permitted an oxymoron, they argued entrapment *sotto voce.* They submit, in essence, that we should overlook any error because entrapment was obviously a viable defense and the interests of justice compelled letting the jury accept that defense if they found it persuasive.

The government argues strongly, and persuasively, that this would be a poor rule to adopt. The appellants not only did not argue "from start to finish" an entrapment claim, they failed to raise it at all. This is just *post hoc* grasping at straws.

■■■■ As we noted, *supra* at n. 6, entrapment is an affirmative defense, *Dickens,* 524 F.2d at 444, ordinarily requiring admission that one engaged in the alleged acts. *United States v. Greenfield,* 554 F.2d 179, 181 (5th Cir.1977), *appealed following remand,* 574 F.2d 305 (5th Cir.), *cert. denied,* 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978). The trial court properly refused to instruct the jury on entrapment after deliberations had begun; holding otherwise would have unfairly prevented the government from responding to that defense. Appellants made a decision to forego this argument. They may not have it both ways once it appears that they made the wrong tactical choice.

### C.

Blanton objected at trial to the introduction into evidence of the fact that he had previously been convicted of murder and served time on that charge before having the conviction set aside in a *habeas corpus* action. He claims this was error because it put his character at issue when he had not opened the door to that matter. The trial

court admitted it as going to the victim's state of mind—that is, to show that Mr. Argenbright would fear Blanton in part because of the prior conviction. Ordinarily such evidence is probative and hence admissible in a Hobbs Act case. *Grassi,* 783 F.2d at 1578. Although Blanton does concede that the conviction would have some probative value in showing fear he claims that it was error under Fed.R.Evid. 403 to admit this evidence for that purpose because the prejudicial effect substantially outweighed any probative value.

■■■■ The decision to admit evidence of extrinsic acts for purposes other than showing the defendant's bad character is subject to a clear abuse of discretion standard. *United States v. Eirin,* 778 F.2d 722, 731 (11th Cir.1985).

■■■■ It was not an abuse of discretion under Rule 403 to admit that evidence in this case. We have invariably held that determining prejudice to outweigh probativeness under Rule 403 is an exceptional remedy invoked sparingly because that Rule has the effect of excluding relevant evidence from the jury's consideration. *Grassi,* 783 F.2d at 1579; *United States v. Meester,* 762 F.2d 867, 875 (11th Cir.), *cert. denied sub nom. Sawyer v. United States,* — U.S. ——, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985). As the Former Fifth Circuit explained in *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979), when discussing incriminating evidence offered by the prosecution, "[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403.... [Rule 403's] major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (Emphasis in original).

Such was not the case below. The evidence of the murder conviction was relevant to the victim's state of mind; one element of a Hobbs Act violation is fear on

the part of the victim that can be deemed reasonable. *Kopituk*, 690 F.2d at 1328. The risk of unfair prejudice due to the fact that the conviction was later overturned was minimized by the fact that the jury was informed of this fact and by the district court's repeated, clear limiting instructions.

Blanton also challenges the trial court's refusal to grant him a mistrial after his parole officer mentioned that a government investigator called her in 1984 to inform her that Blanton had been charged with, but not convicted of, rape in 1982. Again, Blanton objects that this put his character at issue and was not otherwise relevant. He argues that Fed.R.Evid. 404(b) prohibited introducing the other crime evidence because a rape charge had no relevance to the crime here at issue. The decision to deny a motion for a mistrial is entrusted to the sound discretion of the trial court. *United States v. Brooks*, 670 F.2d 148, 152 (11th Cir.), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339 (1982).

The judge was not in error in refusing a mistrial. Blanton's lawyer at first withdrew his motion, apparently reasoning that the testimony properly came in as relevant to FBI Agent Sollars' motive. It was only when the trial court stated that this testimony could not be argued in closing that the motion was renewed. On the other hand, the trial court stated forcefully to the lawyers that it was completely irrelevant; the court firmly instructed the jurors to disregard it. The trial court even asked the jurors if each would be able to ignore the statement; none indicated to the contrary.

There was no Rule 404 violation here because the testimony was not admitted into evidence. Nor was it an abuse of discretion to refuse the motion for a mistrial because there is no evidence of prejudice. The comment slipped out, was promptly objected to, and the judge instructed the jury that it was irrelevant and could not be considered.

III.

For the reasons foregoing, we determine that the appellants have failed to state any basis for relief by this Court. The evidence of guilt of each appellant on the extortion and solicitation charges is more than amply supported by the evidence educed at trial. Neither was there error in the instructions given nor in the trial court's decision to refuse certain instructions. As to Blanton's prior criminal record, the evidence of his conviction for murder was properly admitted. The rape evidence was not admitted and did not justify a mistrial. Finding no error on the record, the decision of the trial court is due, in all respects, to be AFFIRMED.