[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 13, 2011
JOHN LEY
CLERK

No. 10-15877
Non-Argument Calendar

_____

D.C. Docket No. 1:09-cr-00286-RWS-JFK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DWIGHT DARYL OWENS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 13, 2011)

Before TJOFLAT, CARNES and FAY, Circuit Judges.

PER CURIAM:

Dwight Daryl Owens appeals his convictions for (1) robbery of a business

operating in interstate commerce, in violation of the Hobbs Act, 18 U.S.C. § 1951,

and (2) discharging a firearm during commission of a robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). He raises four claims on appeal. First, he argues that the government failed to present sufficient evidence that he was the individual identified as "Robber Number One." Second, he argues that the district court abused its discretion in excluding his proffered expert witness on eyewitness identification. Third, he claims that the court abused its discretion in declining to give his requested jury instruction on eyewitness identification. Finally, he contends that the court abused its discretion and violated his due process right to the presumption of innocence when it admitted a recording of a telephone conversation – a recording that he contends was prejudicial because it indicated that he was in jail at the time of the call. For the reasons set forth below, we affirm.

## I.

Owens was indicted in 2009 and proceeded to trial. Prior to trial, the government moved to exclude the testimony of Owens's proposed expert witness, John C. Brigham, who was to be offered as an expert on the alleged unreliability of eyewitness testimony. He would offer opinions as to (1) the difficulty of encoding a good memory of an armed robber's face, (2) the effect of the detective's instructions on the chance that the witness made an erroneous

2

identification from the lineup, (3) the fact that the witness's inconsistent estimations of the robber's age illustrated the difficulty of making an accurate eyewitness identification, and (4) the "considerable possibility that an erroneous identification could occur under these conditions."

Owens, meanwhile, moved to exclude a recording of a phone call that he had made on May 27, 2009, from his pretrial detention facility, when he spoke to his uncle about hiring an attorney. The call made clear that Owens was in pretrial incarceration, which, he argued, rendered it highly prejudicial under Federal Rule of Evidence 403 and the Due Process Clause, much like displaying a defendant in prison clothing or otherwise informing the jury of the defendant's pretrial detention. In particular, Owens made two statements during the phone call. First, he said to his uncle, "[T]hey got me in – in the federal – penitentiary . . . for a crime that I – I committed by they tryin' to give me a life sentence." Later in the conversation, he said, "I'm not tryin' to get no life sentence . . . for somethin' I ain't really done."

Owens also submitted to the court a set of proposed jury instructions, including a five-and-a-half-page instruction on eyewitness identification. In part, the requested eyewitness-identification instruction included the following statements:

3

- You should also consider how well the eyewitness could see and hear at the time. For example, if a witness is afraid or distracted, his or her capacity to perceive and remember is reduced. A person under stress is more likely to inaccurately remember a face. Similarly, a person is more likely to inaccurately remember a face if there is a weapon present during the incident.

- You should consider how much time passed between the incident and the identification. For example, identification errors increase as time passes.

- You should also consider how certain the eyewitness was in making [the] identification. Certainty may or may not mean that the identification is accurate.

- The law recognizes that eyewitness identification is not always reliable, and that cases of mistaken identity have been known to occur. You should, therefore, view eyewitness identification testimony with caution, and evaluate it carefully in light of the factors I shall discuss.

- Among the more important factors to consider are the following: . . . Did the witness have an adequate opportunity to observe the person who committed the crime? In answering this question, you should take into account matters such as the length of time the witness saw the offender, their positions and the distance between the . . . lighting conditions, and the presence or absence of any circumstances that might focus or distract the witness's attention.

- In general, people are better at identifying persons they already know than persons with whom they have had no previous contact.

- Studies show that when the witness and the person he is identifying are of different races, the identification tends to be

less reliable than if both persons are of the same race.

- Did the witness give a description of the offender immediately after the alleged crime? If so, how well does the defendant fit that description?

- Memory tends to fade over time. And studies show that a witness may subconsciously incorporate into his memory information from other sources, such as description by other witnesses.

- . . . [W]ere the photographs or lineup suggestive in any way? An identification made from a lineup tends to be more reliable than an identification from photographs.

- In the experience of many, it is more difficult to identify members of a different race than members of one's own. Psychological studies support this impression. In addition, laboratory studies reveal that even people with no prejudice against other races and substantial contact with persons of other races still experience difficulty in accurately identifying members [o]f a different race. Quite often people do not recognize this difficulty in themselves. You should consider these facts in evaluating the witness's testimony, but you must also consider whether there are other factors present in this case that overcome any such difficulty of identification.

- [Regarding the need for "double-blind" lineups in which the administrator does not know the identity of the suspect:] Scientific evidence shows that if the person showing the line-up to the witness knows which person in the line-up is the suspect, that this will influence the outcome. The presenter of the lineup will unintentionally, and often without realizing, give non-verbal signals that can influence the witness to pick the suspect. Failure to use this procedure is a significant flaw in conducting a photographic line-up.

5

The district court granted the government's motion to exclude the expert witness, finding that the matter was within the jury's role of determining witness credibility and that Owens would be permitted to cross-examine the witnesses fully as to the accuracy of their identifications. As to the recorded phone call, the court found that prejudice might arise from the "limited indication" that it had been made from jail, but that the prejudice did not outweigh the tape's probative value, particularly in light of the jury's expectation that Owens would have been arrested at some point and the lack of any indication that Owens remained in custody at the time of trial.

At trial, Seo Ahn, the owner of cell-phone store Skytalk Communications, testified that "Robber Number One" entered the store around 7:00 p.m. on May 13, 2008. Ahn turned toward the cash register, then heard a gunshot. Ahn turned to see the robber raising a gun in the air in his right hand. At about the same time as the gun was fired, another individual, "Robber Number Two," came inside and grabbed Ahn's nephew, Eun Youl "Mark" Ok, who had been cleaning near the entrance. The robbers told Ahn and Ok to kneel down and not to move, then opened the cash drawer and took all of the money. The drawer contained approximately $2,500 to $3,000. Robber Number Two then took Ahn to the storeroom in the back, where the robber grabbed some phones. Between the

6

phones from the storeroom and some additional phones from the display case, the robbers took a total of about 20 phones. After Robber Number Two took the phones from the storeroom, he brought Ok into the storeroom. The robbers then fled the store.

Ahn described Robber Number One as a slender black man who weighed approximately 140 to 150 pounds and was slightly shorter than Ahn, who was 5'7". Robber Number One was wearing a hat and a plain white T-shirt. After the government played a video of the robbery for the jury, Ahn continued that Robber Number One was holding an extinguished cigarette butt when he entered the store. Referring to still images that had been printed from the video, Ahn pointed out the pistol in Robber Number One's hand, as well as the locations of the cash drawer, storage room, and display case. Ahn acknowledged that a police officer showed him a lineup at some point but that he was not able to identify just one person as Robber Number One.

On cross-examination, Ahn reiterated that Robber Number One was slightly shorter and slimmer than Ahn, and he stood in the witness box so that the jury could observe his build. He recalled telling the officer at the scene that Robber Number One's skin color "was not extremely dark" and that he was approximately 30 years old, although Ahn added that he had difficulty gauging the age of

7

Americans. Counsel cross-examined Ahn, in part, about the quality of the videotape and whether the lighting on the video would have made the people appear darker.

Ok testified that, prior to the robbery, he saw Robber Number One smoking a cigarette outside and Robber Number Two leaning against a wall. After Robber Number One entered the store, Ok saw that he was holding the same cigarette but was no longer smoking it. Ok was outside the store when he heard the gunshot and looked inside to see what was happening. Robber Number One grabbed Ok around the neck with his left hand and pulled him into the store. The robber was holding the gun in his other hand. After Robber Number One pulled Ok into the store and made him kneel behind the display case, Robber Number Two entered the store. Robber Number One shouted at Ok to sit down and not to call the police, and he collected all of the cash from the cash drawer. Meanwhile, Robber Number One told Robber Number Two to take Ahn to the inventory room.

Ok said that Robber Number One was African-American, approximately 5'6", about 160 to 180 pounds, and a little younger than 40 years old. Ok testified that he had finished sweeping the doormat and the area just outside the door when Robber Number One pulled him into the store, so no trash remained in that area before the robbery. After the robbery, Ok noticed that there was one cigarette in

8

the doorway area. He pointed it out to the police officers and suggested that it might have belonged to one of the robbers. During the time that he was outside after the robbery, Ok did not see anyone smoking. At a later time, an officer showed Ok a photo lineup. Ok told the officer that one of the photographs was of Robber Number One, and he ranked his certainty as "maybe six or seven" on a scale of ten, or 60 to 70 percent.

On cross-examination, Ok said that he originally told the police officers that Robber Number One had a light complexion and that Robber Number Two was in his late 20s. He said that Robber Number One was not skinny, but he had described Robber Number One as being skinny in comparison to Robber Number Two. He thought he had told the officer that Robber Number One weighed about 135 pounds. Counsel cross-examined Ok as to the clarity of his memory of the events and as to which of three cigarettes in a crime-scene photograph was the one he pointed out to the officers. On redirect examination, Ok stated that none of the cigarettes were in the area prior to the robbery.

The government read a stipulation indicating that officers collected a cigarette from the sidewalk in front of the store and that the saliva on the cigarette was found to contain Owens's DNA.

Denise LaSonde, a crime scene technician with the Atlanta Police

Department ("APD"), testified to finding a hole "related to a gunshot" in a ceiling tile. She recovered the only cigarette butt that was in the sidewalk area in front of the store. The other trash in the area, including another cigarette butt, were away from the sidewalk in the parking lot. She did not recover anything from the parking lot.

Investigator Furdge Turner testified that he inherited this case in February 2009 after the original investigator left the APD. He first started working on the case when the crime lab discovered the identity of the individual whose DNA was on the recovered cigarette butt. Upon receiving that report, Turner assembled a photo lineup that included a photograph of Owens at Position 5. He met with Ahn and Ok a few days later. Ahn vacillated between Photographs 5 and 6. Ok selected Photograph 5 right away. Turner could not recall whether Ok indicated a percentage or a range of numbers reflecting how sure he was of his identification.

On cross-examination, counsel questioned Turner about his review of the evidence, the quality of the surveillance video, the accuracy of Ahn's and Ok's identifications, the absence of any other physical evidence connecting Owens to the crime, and the fact that Owens, who was accused of being Robber Number One, was a 47-year-old, 5'7" man who weighed 190 pounds.

The government read a stipulation that every cell phone in the store's

10

inventory had been shipped in interstate commerce from Indiana to Georgia, and it played the recorded phone call for the jury. The court gave the following cautionary instruction to the jury:

> You will recall before we took our break, you were played a tape from a phone call made by the defendant from a detention facility. Let me instruct you that you are not to draw any inferences from the fact that the defendant was in a detention facility at the time that he placed that call. Specifically, you're not to infer from that any matters regarding guilt of the defendant or any inferences concerning whether he posed any safety risk or any other matter of that sort. Essentially, you're to draw no inferences from the fact that the call was placed from a detention facility.

During his case-in-chief, Owens noted that the government had played a slowed-down version of the surveillance video, and he played the original version for the jury. His wife then testified on his behalf, specifically discussing his age, height, and weight. She indicated that Owens did not own clothes like those of Robber Number One and had not had extra cash, cell phones, or other related items after the date of the robbery.

After the defense rested, the court informed the parties that it had decided to give the pattern jury instruction on identification. It concluded that the pattern instruction adequately addressed Owens's concerns and that giving Owens's requested instruction would constitute commenting on the evidence. Owens could argue Ahn's and Ok's uncertainty about their photo-lineup identifications, the

11

possibility that the officer unintentionally gave subtle hints as to which answer he wanted, and the failure of memory over time, but the court was uncomfortable giving an instruction about scientific research into different methods for administering lineups. Additionally, Ahn had testified to his difficulty in distinguishing between African-Americans, so there was a basis for Owens to make an argument about the increased difficulty of cross-racial identification. The court reiterated that the requested instruction "went too far" and would have amounted to "commenting on the evidence and staking out positions," while the pattern instruction made clear that the jury could consider all factors that could weigh on the reliability of the identifications.

During the government's closing argument, the recorded phone call was played again for the jury. During Owens's closing argument, counsel described Owens as "in his late 40s, . . . not skinny, . . . five seven, 190 pounds, dark skinned and [with] tattoos on his arms." He reiterated the witnesses' contradictory descriptions of Robber Number One, had Owens show his tattoos to the jurors, and argued, "You can see Dwight Owens is not the man who is described on that video." He further argued that (1) no one saw Robber Number One drop his cigarette, (2) the cigarette recovered by officers from the curb might have been one that Ok failed to sweep all the way off of the sidewalk before the robbery, (3)

12

Ok testified that the robber's cigarette was directly in front of the door, not on the curb, and (4) the officers only retrieved one of the three cigarettes in the area. He added that one of the photographs showed Robber Number One with a cigarette behind his ear, and that the cigarette appeared to be an all-white, full-sized cigarette, not a small one with a brown filter like the one on the curb. Finally, counsel raised concerns about Investigator Turner's testimony, whether Ok could be considered to have made a positive identification, the effect of stress on memory, Owens's conflicting statements during the phone call, and the absence of any other physical evidence connecting Owens to the crime.

The court instructed the jury, including the pattern eyewitness-identification instruction. The jury found Owens guilty on both counts. Owens was convicted and sentenced to a total term of 300 months' imprisonment.

II.

We review a challenge to the sufficiency of the evidence *de novo*, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Fulford*, 267 F.3d 1241, 1244 (11th Cir. 2001). We will affirm a guilty verdict unless no reasonable trier of fact could have found guilt beyond a reasonable doubt. *United States v. Toler*, 144 F.3d 1423, 1428 (11th Cir. 1998).

13

"[T]he jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Ellisor*, 522 F.3d 1255, 1271 (11th Cir. 2008) (quotation marks omitted).

"To obtain a conviction for conspiring to interfere with interstate commerce through robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a), the government need only prove a robbery and effect on commerce." *United States v. Dean*, 517 F.3d 1224, 1227-28 (11th Cir. 2008). In order to convict Owens under 18 U.S.C. § 924(c)(1)(A)(iii), the government was required to prove beyond a reasonable doubt that (1) the defendant committed a federal crime of violence and (2) he discharged a firearm "during and in relation to" that crime. § 924(c)(1)(A), (c)(1)(A)(iii). Here, Owens contends only that he was misidentified as the individual who committed the charged offenses, not that the government failed to prove any other element of the offenses.

When viewed in the light most favorable to the government, the evidence showed that Ok saw Robber Number One smoking a cigarette outside the store during the robbery. He took the cigarette with him inside the store, and Ok finished sweeping the trash off the sidewalk and into the parking lot. After the robbery, a cigarette butt containing Owens's DNA was found on the sidewalk. Ok picked Owens's picture out of a photo lineup, and Ahn vacillated between

14

photographs of Owens and another man, though he ultimately was unable to make a positive identification. Owens told his family during a telephone call that he was being held for a crime that he committed. Furthermore, the jury was shown multiple videos and screen shots of Robber Number One, and they had the opportunity to compare those images to Owens during trial. Although Owens argues that the eyewitnesses' descriptions of Robber Number One were inconsistent with Owens's appearance, and that the cigarette collected at the scene did not resemble the cigarette held by Robber Number One in the video, the jury was free to review the depictions of Robber Number One and his cigarette and evaluate whether they matched Owens and the recovered cigarette. *See Ellisor*, 522 F.3d at 1271. The jury also listened to the entire relevant section of the telephone call and was free to choose which of Owens's statements, if either, was a credible description of his connection to the offense. *See id.* Under the circumstances, Owens has failed to show that no reasonable juror could have concluded that he was Robber Number One. *See Toler*, 144 F.3d at 1428.

## III.

The "district court's decision to admit or exclude evidence will not be disturbed on appeal absent a clear abuse of discretion." *United States v. Smith*, 122 F.3d 1355, 1357 (11th Cir. 1997) (quotation marks omitted). Under the prior

15

panel precedent rule, we are bound to earlier panel holdings unless and until they are overturned by this Court sitting *en banc* or by the Supreme Court. *Id.* at 1359.

If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact at issue, a witness qualified as an expert may testify to that effect, in the form of an opinion or otherwise. Fed.R.Evid. 702. We have "consistently looked unfavorably on" expert testimony about eyewitness reliability and held that "a district court does not abuse its discretion when it excludes expert testimony on eyewitness identification." *Smith*, 122 F.3d at 1357, 1359.

As both parties acknowledge on appeal, *Smith* clearly indicates that the district court did not abuse its discretion by excluding Brigham's testimony. *See Smith*, 122 F.3d at 1359. Although Owens argues at length that this holding should be revisited, we currently are bound to the *Smith* holding by the prior panel precedent rule. *See id.* Accordingly, Owens has not established reversible error in this regard.

## IV.

We review a district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. Palma*, 511 F.3d 1311, 1314-15 (11th Cir. 2008). "We will find reversible error only if (1) the requested instruction correctly

16

stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give it substantially impaired the defendant's ability to present an effective defense." *Id.* at 1315 (quotation marks omitted).

"A criminal defendant has the right to have the jury instructed on [his] theory of defense, separate and apart from instructions given on the elements of the charged offense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995). Yet "[a] trial court is not bound to use the exact words and phrasing requested by defense counsel in its jury charge." *United States v. Gonzalez*, 975 F.2d 1514, 1517 (11th Cir. 1992). In deciding whether a defendant's requested instruction was substantially covered in the actual charge given, we "need only ascertain whether the charge, when viewed as a whole, fairly and correctly states the issues and the law." *Id.* Further, "a defendant is not automatically entitled to a theory of the defense instruction if that argument is adequately covered in another instruction." *United States v. Blanton*, 793 F.2d 1553, 1561 (11th Cir. 1986).

The pattern jury instruction on identification testimony reads as follows:

The Government must prove beyond a reasonable doubt that the Defendant was the person who committed the crime.
    If a witness identifies a Defendant as the person who committed the crime, you must first decide whether the witness is telling the truth. But even if you believe the witness is telling the truth, you

17

must still decide how accurate the identification was. I suggest that you ask yourself questions:

- Did the witness have an adequate opportunity to observe the person at the time the crime was committed?
- How much time did the witness have to observe the person?
- How close was the witness?
- Did anything affect the witness's ability to see?
- Did the witness know or see the person at an earlier time?

You may also consider the circumstances of the identification of the Defendant, such as the way the Defendant was presented to the witness for identification and the length of time between the crime and the identification of the Defendant.

After examining all the evidence, if you have a reasonable doubt that the Defendant was the person who committed the crime, you must find the Defendant not guilty.

11th Cir. Pattern Jury Instructions (Criminal), Special Instructions § 3 (2010).

In upholding the district court's decision to exclude an expert witness on eyewitness identification, the *Smith* Court noted,

Of course, defendants who want to attack the reliability of eyewitness recollection are free to use the powerful tool of cross-examination to do so. They may also request jury instructions that highlight particular problems in eyewitness recollection. Smith did in the present case and was successful in getting the district court to instruct the jury about cross-racial identification, potential bias in earlier identifications, delay between the event and the time of identification, and stress.

*Smith*, 122 F.3d at 1359. The *Smith* Court did not, however, describe the specific instructions that were given in Smith's case or indicate that the courts must grant

18

such requests.

Here, the pattern instruction adequately covered many of Owens's concerns, such as the adequacy of the opportunity to observe the defendant, the circumstances of the photo lineup, and the length of time between the offense and the identification. *See Blanton*, 793 F.2d at 1561. Although the pattern instruction did not specifically discuss cross-racial identification, double-blind lineup procedures, or the effect of stress and weapons on identifications, Owens was able to cross-examine and argue about each of these points, and he has not shown that the court clearly abused its discretion in declining to accept Owens's view of the science as uncontroverted fact after having excluded expert testimony to that effect. *See Palma*, 511 F.3d at 1314-15; *Smith*, 122 F.3d at 1357, 1359. Viewed as a whole, the jury instructions fairly and correctly stated the issues and law, and they did not substantially impair Owens's ability to present his defense. *See Palma*, 511 F.3d at 1315; *Gonzalez*, 975 F.2d at 1517. Accordingly, Owens has not shown an abuse of the district court's discretion.

V.

Again, evidentiary rulings will not be disturbed on appeal absent a clear abuse of the district court's discretion. *Smith*, 122 F.3d at 1357. An evidentiary ruling will not be reversed unless the error affected the defendant's substantial

19

rights.  *See United States v. Stephens*, 365 F.3d 967, 976 (11th Cir. 2004).  Thus,

the defendant must show that the error probably had a substantial influence on the

jury's verdict.  *Id.* at 977.  A purported due process violation is reviewed for

harmlessness beyond a reasonable doubt.  *See United States v. Harris*, 703 F.2d

508, 512 (11th Cir. 1983).

District courts have broad discretion to admit probative evidence, whereas

their discretion to exclude evidence under Fed.R.Evid. 403 is limited.  *United*

*States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990).  "[E]vidence

may be excluded if its probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of

cumulative evidence."  Rule 403.

In *Harris*, we held that a defendant's right under the Due Process Clause to

the presumption of innocence was violated when he was required to attend the

*venire* in clearly marked prison clothing.  *Harris*, 703 F.2d at 509-10.  We drew a

distinction between prison clothing and the mere admission of evidence that the

defendant had been arrested for the instant charge or earlier offenses:

> In most trials, it is apparent that the defendant was arrested for the
> crime with which he has been charged.  Even where the details of the
> arrest are not revealed during the course of the trial, the jury can

20

easily infer that the defendant was arrested.  The majority of criminal prosecutions are initiated by an arrest; contemporary American juries are aware of this fact. That the jury would learn of Harris'[s] arrest as well as of his prior felony convictions thus does not address the concerns voiced by the [Supreme] Court [regarding prison clothing].

. . . . Forcing a defendant to appear at trial so dressed not only is demeaning; it reinforces the fact that the defendant has been arrested and projects to the jury the mark of guilt, thus eroding the principle that the defendant is presumed innocent until proven guilty. . . . That the jury will learn of his arrest during the course of the trial does not mitigate the harm occasioned by parading the defendant clothed in a shroud of guilt.

*Id.* at 511-12.

The mere admission of evidence that Owens had been arrested and detained at one time did not create due process concerns, particularly as there was no indication that he remained incarcerated at the time of trial.  *See Harris*, 703 F.2d at 511-12.  Furthermore, Owens's recorded statements regarding his guilt or innocence of the offense were highly probative and, thus, the court had broad discretion to admit the recording.  *See Terzado-Madruga*, 897 F.2d at 1117.  The purported conflict between the two statements did not render either one irrelevant to the question of his guilt but, rather, required the jury to evaluate whether either statement was a credible description of his connection to the offense.  *See Ellisor*, 522 F.3d at 1271 (stating that the jury is free to choose between or among the reasonable interpretations of the evidence).  Finally, the district court mitigated

21

any potential prejudice by issuing an explicit, detailed instruction that the jury should draw no inferences from the fact that Owens was in jail at the time of the call. Under the circumstances, Owens has not shown that the evidence of his arrest and detention was so prejudicial as to substantially outweigh the probative value of his statements. *See* Rule 403.

For the foregoing reasons, we affirm Owens's convictions.

**AFFIRMED.**